# Joseph T. Miller, et al. v. Chalkly John.

## Gen. No. 4192.

1. TORT—*when action of, lies against an agent.* The existence of the relation of principal and agent does not preclude the principal from suing his agent in tort, and the measure of damages in such a case is the same as though no such relation existed.

2. AGENT—*liability of, for deceit.* An agent, who makes a positive affirmation as of his own knowledge concerning the quality of land, when he possesses no knowledge upon the subject, is responsible to his employer who has been injured thereby.

3. ACTION FOR DECEIT—*joinder of counts in.* In an action for fraud and deceit, one count charging the defendants directly with fraud and another charging them with a conspiracy to commit such fraud may properly be joined, as the gravamen of the action is the fraud and damage, and not the combination.

4. ACTION FOR DECEIT—*essential elements of.* The essential elements in an action for deceit are representation, falsity, scienter, deception and injury.

5. CONSPIRACY—*when proof of, without supporting allegation, is competent.* Whenever proof of conspiracy is necessary to connect a defendant with a fraud, no allegation of conspiracy need be contained in the declaration.

6. CONSPIRACY—*proof of, in civil action.* Conspiracy to commit a fraud may be established in a civil suit by evidence circumstantial in nature.

7. CONSPIRACY—*competency of acts and declarations of co-conspirators in an action charging.* When a conspiracy in a civil action has been shown to exist, the acts and declarations of each co-conspirator in furtherance of the fraudulent object, are to be regarded as the acts and declarations of all the parties concerned, and are therefore competent, notwithstanding such acts and declarations are in the absence of the others.

8. ESTOPPEL—*when an, operates against conspirators.* Where persons have knowingly made false representations to another with the intention that he should rely upon them, and he has so relied upon them to his injury, such persons can not screen themselves behind the careless confidence engendered by their cunning.

9. CONTRIBUTORY NEGLIGENCE—*when defense of, is not substantial.* The failure of a person, who claims to have been defrauded in a trade, to make examination of that for which he traded, is no bar to his right to recover in an action for deceit where necessity for immediate action had been pressed upon him by the defendants and he was thus induced to make the trade without such examination.

Miller v. John.

Action for deceit. Appeal from Circuit Court of Whiteside County; the Hon. William H. Gest, Judge, presiding. Heard in this court at the April term, 1903. Affirmed. Opinion filed October 8, 1903.

J. E. McPherran, for appellants.

C. C. Johnson and C. C. McMahon, for appellee.

Mr. Justice Vickers delivered the opinion of the court.

Chalkly John, appellee, sued Joseph T. Miller, Frank P. Stabler and Frank W. Walzer, appellants, in an action on the case for fraud and deceit. The declaration is in two counts, the first of which charges that appellee was the owner of 160 acres of land in Whiteside County, Illinois, known as the Jordan farm, worth $80 per acre, and 160 acres in Kansas valued at $7 per acre. That there was a body of land in Barron County, Wisconsin, consisting of 320 acres, which the owners thereof wanted to sell, and that the defendants being desirous of disposing of the Wisconsin land to the plaintiff, wrongfully intending to defraud and deceive the plaintiff, falsely, fraudulently and deceitfully represented to the plaintiff that the Wisconsin land :

(a) Belonged to an estate to which there was a large number of heirs; that the owners could not agree because each one wanted this particular tract; that the rest of the estate had been divided, and that the owners had agreed to sell this to an outside party in order to make it satisfactory and that it could be had at a great bargain;

(b) That there was a good log house and a good log barn on the land;

(c) That it was all fenced;

(d) That about forty or fifty acres was cleared and seeded down in timothy, and the balance was covered with good timber, such as would make good lumber, and that the part north of the cleared land would make 800 or 900 cords of wood worth $5 per cord in that locality, and that the owners had been offered $1,600 for the timber on the stump on that part north of the cleared land, and that the owners asked $8,000 for the 320 acres, and the land was cheap at $25 per acre;

(*e*) That the land laid as nice as his Jordan farm and was not broken or stony, and that if the owners would trade it to appellee for his Jordan farm, appellee would have the best of the bargain.

It is also averred that the appellee, not having seen the Wisconsin land but relying and confiding in the statements and representations of the appellants, bargained with appellants to exchange his Jordan farm and his Kansas 160 acres for the Wisconsin land, and executed deeds to the defendants for the same.

All of the foregoing representations of the defendants respecting the Wisconsin land are charged to be false, made knowingly and wilfully for the purpose of misleading, deceiving and defrauding appellee, and that the Wisconsin land was of little or no value, by means whereof the appellee is damaged to the amount of $8,000.

The second count is substantially the same as the first, except that it charges that " the defendants combining and confederating then and there represented to the plaintiff and so promised and agreed with the plaintiff that they, the defendants, would, as the plaintiff's agents, trade and exchange for the plaintiff his said farm subject to said mortgage, for other farm lands of greater value, consisting of 320 acres of land in the State of Wisconsin," and then and there falsely and fraudulently made the representations in substance set out in the first count of the declaration.

Issue was joined on a plea of not guilty. Trial by a jury resulting in a verdict of guilty as to all of the defendants and assessing the plaintiff's damages at $5,440, of which $940 was remitted at the suggestion of the trial court, which, after overruling motion for new trial, rendered judgment on the verdict for $4,500, to which exception was taken, and the case is before us by defendants' appeal from that judgment.

Fifteen different assignments of error are made on the record, but it will not be necessary to take all of them up in detail or in the order set out in the abstract or the brief of appellant. It is contended that the court erred in deny-

Miller v. John.

ing the motion for new trial because the evidence did not justify a verdict against all of the defendants jointly or either, or any of them. It is also contended that the motion for a new trial should have been sustained because there was a misjoinder of causes of action in the declaration; the argument being that because the second count sets out the contractual relation of principal and agent, that the second count is based on contract and that the measure of damages under the two counts is entirely different.

Before taking up the first assignment of error, we will dispose of this one. While the second count introduces the relation of principal and agent, it is not a count on the contract, but is in tort for fraud and deceit. The relation of principal and agent is no reason why the agent may not be sued in an action of tort by his principal, and in such case the measure of damages is the same as if the relation did not exist. In Page v. Wells, 37 Mich., at page 421, Chief Justice Cooley says :

" For negligence, bad faith or dishonesty he (an agent) would be liable to his employer."

Again he says :

" A positive affirmation of the quality of lands as of one's personal knowledge when he has no knowledge on the subject, whereby his employer is misled and injured, should certainly render the person making it liable, either on the ground of bad faith or negligence."

The same eminent judge lays down the same doctrine in his work on torts. Vol. 1, p. 526. The following authorities support the same doctrine. Story on Agency, Secs. 218 and 333; Prescott v. White, 18 App. 332; Shipherd v. Field, 70 Ill. 438. Nor is it of any importance that in the first count the defendants are charged directly with the fraud and deceit, while in the second count they are charged with conspiring and confederating together for the purpose of committing a fraud. The cause of action in both counts is substantially one for fraud and deceit by false representations, and the right of recovery in both counts is governed by the law applicable to cases of that

character. The allegation of conspiracy and combination of the defendants to commit the fraud does not affect the essential grounds of recovery. The gravamen is the fraud and damage and not the combination. Brackett v. Griswold, 112 N. Y. 454.

The means by which a fraud may be perpetrated are immaterial, except in so far as they may show, in connection with the damage sustained, an actionable injury. In such case the proof of a conspiracy is only important to connect a defendant with the transactions and to charge him with the acts and declarations of his co-conspirators, where otherwise he could not have been implicated. Wherever it becomes necessary to prove a conspiracy in order to connect a defendant with a fraud, no allegation of conspiracy need be in the declaration in order to make the proof competent. Hutchin v. Hutchin, 7 Hill, 104; Brackett v. Griswold, *supra.*

The essential elements in an action for fraud and deceit have been well defined ever since the action came into use. They are tersely stated in Arthur v. Griswold, 55 N. Y. 400, by Chief Justice Church: "Representation, falsity, scienter, deception and injury." Commenting on this definition of Justice Church, the Court of Appeals of New York, in 112 N. Y. 467, *supra,* say:

"There must have been a false representation, known to be such, made by the defendant, calculated and intended to influence the plaintiff, and which came to his knowledge, and in reliance upon which, he, in good faith, parted with his property or incurred the obligation which caused the injury of which he complains."

No further citation of authorities is necessary to sustain the foregoing proposition.

Having in mind these elementary principles at law, and that a conspiracy to commit a fraud, as well as fraud itself, may be established by circumstances in a civil action therefor by the injured party, and that when once shown to exist, the acts and declaration of each co-conspirator, in furtherance of the fraudulent object, are to be regarded as the act and declaration of all the parties concerned in the un-

lawful enterprise, we will proceed to examine the first assignment of error : Does the evidence sustain the verdict ? Chalkly John had traded some lots in the town of Hammond, Ind., and $400 in cash for 160 acres of land in Hodgemen Co., Kansas, through the recommendations of defendant Walzer. Walzer assured John that Kansas land was worth $7 per acre. It turned out that the land was practically of no value. John was offered $1 per acre for it which appears to have been the best offer ever made to him.

Some time in the spring of 1901, Walzer called John into his office, and they went into the back room and closed the door and Walzer told John of a trip he had made up in Wisconsin; and that it was a very fine country up there and some very fine bargains to be had, and that he thought he could get him, John, a very fine farm up there for this Kansas land and some of the Hammond lots. The parties met again in a few days and Walzer told him there was a very fine tract of 320 acres up in Wisconsin which could be had very cheap, either for cash or trade. That it was a piece of property belonging to an estate; he said that all the rest of the estate had been divided and this being the most valuable, all the parties wanted this, and they had finally agreed to sell it to some one outside the family. Walzer said he had not seen the land, but that Mr. Stabler and Mr. Miller had, and they both said it was the best piece of land they had seen in that section of the country. He said to get that, John would have to put in the Jordan farm, and that by putting in the Jordan farm John could get $3,000 or $4,000 in money. Walzer urged the advantages of the deal on the attention of John and artfully tried to interest him in the Wisconsin land. This was on Saturday in Walzer's office. Again on Monday or Tuesday following, Walzer met John on the street and invited him to come along over to his office. They went and Walzer again urged John to make the trade for the Wisconsin land. He says: " You rent the Jordan farm, and you might as well rent land in Wisconsin as in Jordan.

You can make more money out of this land than out of the Jordan farm and not have any interest to pay." (The Jordan farm had a $6,000 mortgage on it.) Walzer said: " I did not see this land but Mr. Stabler and Mr. Miller did. I will go out and have Mr. Stabler come over and tell you about this land." Walzer left the office and in a few minutes returned with Mr. Miller. Mr. Miller came in, shook hands with John; talked a little about being in the army with John, and finally turned to Mr. Walzer and said: " Frank, what do you want me to tell Chalkly?" "Tell him about the Wisconsin land we were talking about." " What land ? " says Miller, " that 320 acres ? Why I was thinking of taking that myself." Thereupon Mr. Miller, who had seen the land, gave Mr. John, his old army comrade, a most glowing description of this farm; told how he walked through the waving fields of timothy, the finest he had ever seen; how the luscious strawberries were blushing at his feet; the houses, barns, timber, fences, pasture fields of sweet smelling clover, meadows of timothy, three tons to the acre, and the ground covered with strawberries passed in grand review before this reunion of old army comrades. John testifies that he asked him particularly whether the land was broken and he said not broken. John said, "Any stone on it?" " No, no stone on it," replied Mr. Miller. John asked, how about orchards ? Mr. Miller said that if the farmers around there wanted an orchard, they had to go about five miles further up where it was stony; that trees did not do well on land that was not stony. He then tells John about how he found a lot of land seekers at the hotel on his return, that they were inquiring of him if he knew anything of this 320 acres, but he adds, "I was not fool enough to tell them. I wanted that to myself." He had gone up there to buy land for himself, and was figuring on getting a tract of 11,000 acres of timber; he thought he would get it, and if he did, he did not care about this 320 acres; he said he was going back to Wisconsin in a few days, and as he and John had served in the army together, if there was anything he

could do for John up there he would be glad to do it, and would not charge him anything. Walzer also said, that since John had been cheated in the Kansas deal by Shuman lying to him, he would not charge him anything, and Walzer would make this Wisconsin deal to make good the loss on the Kansas deal. Numerous interviews were had with John by Walzer, but more frequently by Walzer and Miller, at all of which they were both apparently over anxious to confer a favor on Mr. John by helping him to trade his Jordan farm and his Kansas land for the 320 acres in Wisconsin. In the meantime, the evidence shows that defendant Miller made a second trip to Wisconsin and acertained, as he said, that he was going to get the 11,000 acres, and that he was willing to forego his own longings to possess the 320 acres, in favor of his old comrade in arms.

Stabler and Miller are planning another trip to Wisconsin, and in order that they may be able correctly to describe and properly represent the Jordan farm to the Wisconsin party to whom it was to be traded, made a trip at their own invitation to see and examine the Jordan farm. They didn't want to trade the land and misrepresent it to the party. They had not seen the Kansas land, nor had either of them seen any oné who had seen it, yet this land was to be " put in," and nothing is said about the possible danger of misrepresenting this tract to a stranger who had not seen it.

Stabler's visit to the Jordan farm is the first act of his which in any way connects him with the efforts of Miller and Walzer to confer a great favor on Mr. John. It was finally arranged that Miller and Stabler, who were going to Wisconsin on other business, should undertake to make the trade for Mr. John, and to this end John executed deeds to his Jordan farm to a man by the name of Pettit, and a deed to the Kansas land, leaving the grantee's name in blank; Miller and Stabler executing an agreement to John to return the deeds if the trade was not made. With these two deeds in their possession, a blank quit-claim deed Illinois form, they went to Wisconsin, found the owner of

the 320 acres and it turns out that it did not belong to an
estate but on the contrary the equity belonged to Mrs.
Pettit alone.   The trade was consummated, and Miller and
Stabler paid Pettit $3,000, and the blank quit-claim deed
came in conveniently for the conveyance of the Jordan farm
from Pettit to Miller and Stabler.   Nothing was said to
Pettit about the Kansas 160 acres, although John had been
assured that it would be necessary to put that into the deal.
The quit-claim deed from Pettit to Miller and Stabler was
not offered on the trial.   The deed to the Kansas land, exe-
cuted in blank, was delivered by defendant Walzer to John
nearly a year after these transactions.   The delivery was
after this suit was begun, and up to that time Mr. John had
been under the supposition than the Kansas land had been
put in on the Wisconsin deal.   The deed was passed to Mr.
John with other papers without any explanation whatever.
The quit-claim deed of Pettit to Miller and Stabler was not
placed on the records of Whiteside county until an oppor-
tunity to sell the land had been found, and then the deed
was recorded one day after the deed conveying the Jordan
farm from Miller and Stabler to an innocent third party.
The price Miller and Stabler received for the Jordan farm
was $16,000.

After the trade was closed up in Wisconsin, Stabler tel-
egraphed Walzer that the deal was closed.   It is an impor-
tant fact here to be noted that at the time the deed to the
Pettit land was executed in Wisconsin, there was a mort-
gage on it in favor of Coe Bros., and that one of the reasons
held out to Mr. John why he ought to make the deal, was
that he had a mortgage on the Jordan farm and the 320
acres would be clear, from which the most favorable infer-
ence to the defendants is that they did not intend to return
to Mr. John a deed for a mere equity where he expected a
clear title; hence the inference that the reconveyance to Mil-
ler and Stabler of the Jordan farm and the payment of the
$3,000, thus putting the cash in Pettit's hands with which
to clear up the Coe mortgage, was a part of the original un-
derstanding with Pettit.   Miller and Stabler contend that

the purchase of the Jordan farm by them was an after-thought; that at the time they delivered Pettit the deed to the Jordan farm and received the Pettit deed to John, they had not thought of buying the Jordan farm of Pettit. Why was the quit-claim deed taken along? What other possible use could they expect to make of an Illinois form of quit-claim deed? If there was no understanding that Miller and Stabler would buy the Jordan farm of Pettit, how is it that they could induce Pettit to sign a deed to this 320 for 160 acres of land in a foreign state, which he had never seen and knew nothing of except as he got it from these two defendants, who were almost strangers to him? Men do not ordinarily repose so much confidence in strangers. After the trade was made, Mr. John made a trip to see the Wisconsin farm. A man by the name of Prock, a real estate agent who had been convenient and useful heretofore in the deal, was notified that John was coming and to look out for him. Prock met Mr. John at the hotel, drove him out and showed him the land; that is, they drove by it, never got out of the buggy, and did not make any careful examination. The weeds and grass covered the land and the green leaves hide the wood land so that John got a very imperfect idea of the real character of the land. After his return, he expressed himself to numerous persons as being satisfied with the trade, but it is apparent that he did not know at the time scarcely anything about the land. Subsequent investigation disclosed the fact that Mr. John had been outrageously swindled out of his Jordan farm; that the 320 acres he had was a pile of stone, a burnt forest and a tamarack swamp; that the stone was so thick you could walk over the land without stepping off of a stone; that the land could not be plowed on account of the stone; that very little had ever been plowed; that there was no hay on it, and only 20 acres appeared to have been seeded to timothy. That the best timber had been cut off and what remained had been through a forest fire and much of it was dead. That the land was fenced only in part; that the house was an old log hut scarcely fit for anything; that

the barn was worthless; in short, if the witnesses are to be believed, this tract of land is substantially worthless.

But it is said that the defendants all testify that they did not make any of the representations to the plaintiff respecting this land, and no one but the plaintiff testifies they did. It is admitted that John never saw the land until after the trade was made. Miller and Stabler had. How did it happen that John ever was brought to a state of mind in which he was willing to deed away a farm worth $16,000, with only $6,000 encumbrance on it, and put in 160 acres in Kansas which he had paid several lots in Hammond and $400 cash for, unless some one had given him to understand and believe he was getting something near a fair equivalent? If he did so understand and believe, who had given him the facts upon which such belief rested? He had no source of information except through these defendants. John would not have acted as he did, if he had not believed the Wisconsin land was a very valuable farm. He could not have such belief without information. He could not have the information except through some means, and he had no means except through these defendants, therefore if his acts are to be judged as those of other rational men, we are constrained to believe that the jury did right in finding that John's evidence, being reasonable and corroborated by the facts and circumstances, as it is, was entitled to more weight than the denial of all three of these defendants.

But it is said appellee should have gone to see this land, and having failed to do so, he is guilty of such negligence that he cannot recover. To this contention there are two answers: First, if the defendants were guilty of making the false statements alleged, and they were made knowing them to be false, and with the intention that the plaintiff should rely on them, and he did so rely on them, to his injury, then the defendants cannot screen themselves behind the plaintiff's credulous confidence which had been engendered by their own artful cunning. Linington v. Strong, 107 Ill. 295. The parties were not on an equal footing and the doctrine of contributory negligence has no application.

Second, the plaintiff stated in his interviews with Walzer and Miller that he did not like to trade for this land without seeing it, but he could not go and see it for a month on account of business engagements. To this it was replied that it ought to be attended to at once; a month's delay might lose him the bargain; and in this way John was brought to the decision to take his chances and trust to the defendants to keep him from being cheated. If the necessity for immediate action was mere artifice, designed to prevent a delay and an opportunity to inspect the land, and to further impress John's mind with the desirability of the bargain by suggesting the improbability of its remaining on the market for one month, and it did in fact have that effect, then the failure to make such examination, even if he had been otherwise required to do so, cannot be available as a defense. Schwabacker v. Riddle, 99 Ill. 343; Hicks v. Stevens, 121 Ill. 186.

It thus appears from the foregoing review of the evidence that the defendants Walzer and Miller made substantially the misrepresentations set out in both counts of the declaration. That they were false, is beyond dispute, and that they were knowingly false, so far as Miller is concerned, is equally clear; and that they were made with the intent and expectation that John would rely on them, and that he did rely on them without any negligence being imputable to him, and it follows necessarily that the verdict as to Miller is sustainable under the plainest principles of law and reason.

The liability of Walzer and Stabler, while it is equally clear, rests on somewhat different grounds. The evidence of a conspiracy between these defendants to swindle and defraud the appellee out of a valuable farm, is found in the fact that they were all actively engaged in bringing about this end. Walzer sought out the appellee, invited him to his office; brought Miller in to talk with appellee about the Wisconsin deal. Stabler and Miller went to see the Jordan farm; deeds were prepared in Walzer's office, when all three of the defendants were there with John. Miller and Stab-

ler went to Wisconsin, made the deal, and returned the owners of Mr. John's Jordan farm. The deed was not recorded until after they had sold the farm, and nothing was said to John about their purchase from Pettit, or that the Kansas land had not gone into the deal until after this suit was begun. These circumstances are inconsistent with an honest purpose on the part of these defendants and lead to the conclusion of a combination between them for the purpose of perpetrating a fraud on appellee. The law treats the case among conspirators as a virtual agency, of a limited nature, arising *ex maleficio*, and hence upon a charge of a combination to defraud, the declarations and acts of each of the parties to the combination relating thereto, are evidence against the others, although made in the absence of the others. Bigelow on Fraud, Vol. 1, p. 166; Livermore v. Herschell, 3 Pick. 32; Page v. Parker, 43 N. H. 363; Tappan v. Powers, 2 Hall, 277; Doremus v. Hennessey, 176 Ill. 608. And this rule is applicable to criminal prosecutions, involving a conspiracy, as well as to civil actions. Spies v. People, 122 Ill. 1. It follows, therefore, that Walzer and Stabler are liable, not alone for the part they personally took in the fraudulent scheme, but are also chargeable with the acts and declarations of Miller. The verdict is not therefore contrary to the evidence, and the assignment of error raising that question is not sustained. There are numerous other assignments of error, all of which relate to the giving and refusing of instructions, the admission and rejection of testimony, the excessiveness of the verdict and the refusal of the court to quash certain interrogatories and the answers thereto in depositions, but having reached the conclusion that none of the contentions of appellants are well founded, and that there is no error in the record, a further discussion of these several assignments of error would be of no advantage.

The judgment is affirmed.

*Affirmed.*