## Charles H. Myerhoff, Appellee, v. F. S. Tinslar et al., Appellants, impleaded with George W. Eastburn.

## Gen. No. 5,590.

1. CONSPIRACY.—*fraud and deceit.* An action on the case for conspiracy, fraud, and deceit, is maintainable against the directors of a company and their broker, where it appears that at a director's meeting, they voted in favor of a scheme to raise money, proposed by the broker, whereby district sales managers were to be hired at an attractive salary and commission on condition that $5,000' worth of stock be taken and paid for in cash, with such provisions, that made it certain that the salary and commission could not be earned, and would not be paid, and where it further appears that the plaintiff was induced to become such a manager and purchase the amount of stock required, because of padded financial statements, misrepresentations as to dividends and earning capacity, and because certain watered stock was represented as paid for in cash, etc.

2. CORPORATIONS—*when directors responsible for false representations though not personally made.* Where the directors of a corporation vote to authorize the selling of stock in a fraudulent manner, they are responsible for all that is done, although they do not personally make false representations.

3. JUDGMENTS—*where one defendant not served.* Where a judgment is entered against "the defendants," and one of them was not served and did not appear, the judgment is valid against all except such person.

4. APPEALS AND ERRORS—*index to abstract.* Appellate Court Rule 16, regarding the indexing of exhibits and documents in evidence, should be closely followed.

Action on the case. Appeal from the Circuit Court of Kankakee county; the Hon. CHARLES B. CAMPBELL, Judge, presiding. Heard in this court at the April term, 1912. Affirmed. Opinion filed June 27, 1912. *Certiorari* denied by Supreme Court (making opinion final).

JOHN S. STEVENS and COOPER & HOBBIE, for appellants; CLARENCE S. DARROW, of counsel.

RALPH R. LOUNSBURY, PHILIP J. MAGUIRE and AMOS H. ROBILLARD, for appellee.

MR. PRESIDING JUSTICE DIBELL delivered the opinion of the court.

This was an action on the case for deceit, brought on December 21, 1909, in the Circuit Court of Kankakee county, by Charles H. Myerhoff, of Evansville, Indiana, against F. S. Tinslar, Robert W. Wilkinson, R. F. Myers, William B. Fleager, F. L. Munroe and George W. Eastburn. Service was not had on Eastburn and he did not appear or defend. There was a trial and a verdict finding the defendants guilty and assessing plaintiff's damages at $7,475.80; a motion for a new trial was overruled; and all the defendants except Eastburn appeal to this court from the judgment entered upon the verdict.

The declaration consisted of an original count and of an additional count, which were amended, and in which it is charged that the defendants conspired together to defraud plaintiff of the sum of $5,000 by misrepresenting the financial condition of the Kankakee Manufacturing Company and the value of its capital stock, through a large number of representations and allegations of fact set out at length in the declaration and which the declaration avers were each false and at that time known to the defendants to be false, coupled with which were certain promises by the company to plaintiff which defendants caused to be made for the purpose of deceiving and defrauding plaintiff, and which defendants and the company knew would not be fulfilled and performed and did not intend should be fulfilled and performed, and which defendants then intended to prevent the company from fulfilling and performing; and that thereby defendants did defraud and deprive plaintiff of $5,000 and of the use of that sum from April 11, 1907, and put him to great trouble, loss, damage and expense. The various statements and representations by the defendants which are alleged to have been false and their various acts which were alleged to have been fraudulent and intended to deceive are set out at

great length in the declaration and are too numerous to be stated in full here. They are the acts, statements and representations detailed in the evidence, which is of great length. The plea was "not guilty."

The proof establishes without question many of the following facts, and the others are shown by a preponderance of the evidence. All the defendants except Munroe were directors of the Kankakee Manufacturing Company, located at Kankakee, Illinois. This concern was originally organized in 1891, under the name of the Perfection Paper Bag Holder Company, of Sheldon, Illinois, with a capital stock of $20,000, its charter running for twenty years and authorizing only the business of manufacturing paper bag holders. Its powers, so far as relates to the business it was authorized to carry on, have never been enlarged or changed, but in 1894 its name was changed to Sheldon Novelty Company. In 1899 the company increased its capital stock to $50,000 and changed its location to Kankakee, Illinois. In 1906 it changed its name again to Kankakee Manufacturing Company, hereinafter called the company, increased its capital stock to the sum of $150,000, and engaged in the manufacture of various articles of furniture and heating apparatus. Eastburn, Fleager, Myers and Wilkinson had been stockholders in the company from its inception. Tinslar first became interested in the concern in 1902. The company had apparently been prosperous during the years in which it was located at Sheldon, and for a time after removing to Kankakee, but the change in location involved the purchase and equipment of a much larger plant, and the earnings of the company, for a few years after the removal, went into payments for the new plant, at least in part. At the close of the business year 1905, the books of the company showed an apparent surplus of $63,259 and directly thereafter, or on February 26, 1906, its capital stock was increased, as above mentioned, to $150,000, and a stock dividend of one hundred

per cent. on the then capital stock was declared, that is, $50,000 of the increase was issued as a dividend to the stockholders, leaving another $50,000 of stock unissued.

Early in June, 1906, at an informal meeting of the directors of the company, various plans were discussed for selling its capital stock. At this meeting appellant Munroe, of Chicago, a stock broker, was present and proposed a plan for selling the stock which was finally adopted; and at a later meeting of the directors, when all the defendants were present, a contract was authorized and entered into between the company and Munroe, by the terms of which Munroe was to establish selling agencies for the company's products, the managers of such agencies were to be required to purchase stock in the company at par on their making contracts of employment with the company, and Munroe was to be paid for his services all that was received for said stock in excess of seventy per cent. of its par value, and Munroe was to have the exclusive right to sell said stock for one year. Shortly after this contract with Munroe was entered into another stock dividend of $50,000 was voted, thus covering all of the increase of stock authorized in February, 1906, and thereafter, and at the same meeting it was ordered that the company's capital stock be still further increased to $250,000. The stock dividends of 1906 went to those who were then stockholders, chiefly the defendants, and this last increase of $100,000 was the stock which was to be sold by Munroe under the terms of his contract with the company. It is in evidence that Munroe sold the entire $100,000 worth of stock, that he was paid $30,000 for selling it, and that there were thereby created twenty-one such managers of selling agencies.

In March, 1907, appellee noticed an advertisement by the Kankakee Manufacturing Company in certain newspapers published in Evansville, Indiana, where he lived, and, as he was seeking for employment, he

responded at once. The advertisement was as follows:

"Wanted: Large, well established manufacturing company making staple line of goods widely known, wants satisfactory man with $5,000 cash to establish and carry on branch business. $250 per month salary and all expenses with share of profits extra. Unusually safe investment, permanent engagement, and high class business. Good for $5,000 per year or better, with big future increase. For particulars, furnish references and address J. Barton, Trude Bldg. Chicago."

There seems to be no evidence in the record concerning the identity of J. Barton, but that this advertisement was published by Munroe for the Kankakee Manufacturing Company appears from the fact that the reply to appellee's original letter of inquiry was signed: "Kankakee Manufacturing Co. by F. L. Munroe, Mgr. Dept.," and that it referred to "Your recent inquiry addressed to our advertising agents." Appellee had written his first letter of inquiry on March 25, 1907, and the reply from Munroe was dated March 26th. This reply was on the letter head of the Kankakee Manufacturing Co. at Chicago, and was of considerable length, and contained many representations as to the business of the Kankakee Manufacturing Company, among which were the following:

"Sole manufacturers of Cook Heating System, which is considered altogether the most economical and satisfactory heating apparatus for general use. * * * Is operated at great saving of fuel, especially adapted for heating public buildings or private houses. You can see our products are in line of every-day necessities, and large market for them throughout your section with local dealers in towns, villages, hardware, furniture and general stores, also with builders and private consumers; thoroughly established, large profitable trade. * * * Paid capital stock was $150,000 with net assets considerably in excess of that amount. * * * Expect to pay substantial dividends each year. * * * Are able to compete favorably with anyone in our line. Make strictly first class

goods; in many respects far in advance of competitors. * * * Would want you to invest $5,000 and become stockholder. Will appoint successor to take your interest in company off your hands at original cost at expiration of term of engagement, in case anything should prevent your continuing with us. * * * Want to be satisfied of your ability to fill place successfully, and would reserve right to terminate agreement and also to purchase your stock in case you should prove unfitted for position or unable to do a reasonable amount of business. Willing to pay salary of $250 per month and all necessary expenses of carrying on business. Also extra 10% on net sales. This alone would make you from $3,000 to $5,000 a year to start with, in addition to regular salary. * * *"

As the result of this and other correspondence with Munroe in the course of which plaintiff was referred to the last annual statement of the company, and to the rate books as evidence of its financial standing, plaintiff had an interview with Munroe at his office in Chicago on April 10, 1907. Munroe told plaintiff that the company was increasing its capital; that it was going to do a larger business; that business was good; that the company was doing a business of $450,000 a year; that the stock paid six per cent. dividends. Plaintiff then went to Kankakee, where he met Eastburn and Tinslar, the former the president and the latter the secretary, treasurer and general manager, and was shown around the plant. Eastburn told plaintiff that the company had done a business the last year of $250,000. Plaintiff also consulted the rating books of Dun and Bradstreet and found the assets of the company listed at from $200,000 to $270,000. Thereafter plaintiff returned to Chicago, signed the required contract with the company, paid Munroe $5,000 and received from him a certificate for plaintiff's fifty shares of the capital stock of the company. By the terms of this contract, which contained other provisions not necessary to be here stated, the company employed plaintiff as its special sales manager in Evansville and as much territory contiguous thereto

as he could properly handle for three years from April 11, 1907; required the company to furnish plaintiff with catalogues, circulars, samples, and such instructions, suggestions and advice, as would enable plaintiff to carry on his business with the highest degree of success; allowed plaintiff various discounts (the deduction of which would leave a certain "net price") and a salary of $250 per month and ten per cent. of the net receipts, and his necessary expenses, including rental for headquarters, salary for clerical help, postage, etc. It required that, upon signing the contract plaintiff should buy fifty shares of the company's capital stock and pay it $5,000 therefor. It provided that plaintiff, at his option, might renew the contract for another five years, but that if he did not, the company or his successor in the position should buy and he should sell his fifty shares of stock for $5,000 in cash. It also provided that, if plaintiff and his agents did not sell at least $1,000 worth of goods per month, at said special net price, then the company could, at its option, treat the contract as void, and plaintiff agreed, if requested, to sell his stock to the company or to his successor for $5,000. There was also a provision that, if the company canceled the contract before its expiration, it would immediately buy plaintiff's stock for $5,000 in cash.

The record contains much evidence showing the efforts thereafter made by plaintiff to secure business for the company. He made a thorough canvass of the trade in and around Evansville, but with little success. He had been urged to push the sale of the Cook Heater and had been promised that a sample of that article would be furnished him at once, but such sample was not sent him until a considerable period of time had elapsed, and when received by him it was so broken and incomplete as to be of no use to him. Various supplies of stationery, etc., which had been promised him before the contract was entered into were not furnished. His monthly sales were less than $1,000

in each month during which he worked for the company, and the company refused to pay him the salary of $250 stipulated in the contract, but reduced his salary to the proportion made by his sales. These reductions in salary were accepted by plaintiff under protest. Plaintiff also attempted to establish a market for the goods of the company through the efforts of salesmen in the country surrounding Evansville, but with very little success. On May 25, 1907, he wrote the company, in part as follows:

"I am now satisfied I cannot make a living out of my efforts under present conditions, and think it best that the contract between us be annulled after the end of the month that expires on the 11th of June, 1907, and the return of $5,000 in cash for the stock. * * · * Trust you will see necessity of me looking for another place."

Further correspondence ensued, but the company refused to purchase plaintiff's capital stock. Plaintiff considered himself out of the employ of the company after June 11, 1907, but was unable to sell his stock, and, after protracted negotiations, commenced this suit in an action on the case for fraud and deceit against the directors of the company and Munroe, the agent who assisted in persuading him to enter into the contract and to buy the stock, for the fraudulent representations of fact, whereby he was induced to buy stock in the company; and he claims that these fraudulent representations were made to him by the officers, directors and agents of the company, and were the direct consequence of a conspiracy entered into by such persons for the purpose of defrauding plaintiff and others.

At the time plaintiff entered into the negotiations which led up to the execution of the contract, he was told by Munroe and also by others of the defendants various things with regard to the financial condition of the company and the amount of business it was doing and expected to do in the future. He was told

that the stock was worth more than par, and that it was paying six per cent. dividends. In fact it had not earned nor paid any dividends from 1901 to 1906. In the six months preceding this transaction with plaintiff it had declared two quarterly dividends of one and one-half per cent. each, but the jury were warranted in finding that there had been no profits, and that there was a serious deficit, and that these dividends were a part of the fraudulent scheme to delude unwary persons into buying this stock. Plaintiff was also referred to the commercial agencies of Dun and Bradstreet, and he obtained from those concerns information with regard to the company, which information had been furnished to them by the company itself, through its officers, defendants here. These financial statements were misleading in many respects. Among the assets were listed "Accounts at realizable value, $32,689.32," whereas, the proof showed that in this item was included at least $7,000 worth of accounts which had formerly been given up by the company as uncollectible and had only been restored to the company's books shortly before this statement was made, for the apparent purpose of untruthfully padding the statement and thereby deceiving those who resorted to that source of information. Another item was: "Real estate and buildings owned by the company with equipment as appraised by American Appraisement Co. of Milwaukee, $112,760.26;" while the proof showed that, in making such appraisement the appraisement company valued everything, buildings, machinery and all, as if new, though the buildings were old and the machinery, or at least most of it, not new, and the real value was about $30,000. Another item in this financial statement was: "Other assets, consisting of drawings, patents, cuts, photos, miscellaneous, etc., $48,410.01." The evidence shows that, shortly before the making of this financial statement, the bookkeeper under orders from some one or more of the defendants, had placed upon the com-

pany's books as an asset, the item of "good will" and valued it at $40,000; that such an item had never before been listed as an asset; and that it appears in this financial statement under the name of "miscellaneous." The financial statement from which we have just quoted was made by defendant Tinslar under date of January 23, 1907, and was received by Dun & Company that same month, and it is entitled: "Statement as to basis for credit made to the Mercantile Agency, R. G. Dun & Co., for the use of its subscribers only, by Kankakee Manufacturing Company, a corporation." This statement was made at a time when its business was decreasing and when its profits had entirely disappeared. The books were made to show a gain of over $36,000 in 1906 by setting down "Good Will" at $40,000 and another fictitious item of $4,500 when in fact there had been a loss instead of a gain in that year. Defendants proved that this company, or its predecessor, Sheldon Novelty Company, had been very successful and had paid large dividends during the years from 1895 to 1901, but it is clear, from the evidence, that after 1901 the prosperity of the company suffered a serious decline. As already stated, from 1901 to 1906 no dividends of any kind were paid; and though in 1906 quarterly dividends were declared, they were not based upon any profit earned and received by the company. This is the time when a financial statement was furnished to the mercantile agencies which was inflated by the inclusion of bills receivable which were in fact uncollectible, and by valuations of old buildings and equipment as new and modern, and by an item of "goodwill" placed at $40,000. It is clear that, if this financial statement had not been made under these conditions and in this manner, the statement would have revealed a deficit instead of a surplus. It is also clear, from the evidence, that before this statement was issued, the defendants held a meeting, as directors and officers of the company, to devise means for raising

money for the company, and that they there conceived and adopted and each voted for and authorized the plan of appointing district sales managers at an attractive salary and commissions, but with the requirement that such persons first purchase a large amount of capital stock in the company and pay for it in cash, and with provisions which made it certain that the salary and commissions could not be earned and would not be paid. Discussion then by several defendants shows that they considered that it was the provision for a salary of $250 per month which would sell this stock, and that they knew that they could not do this with experienced salesmen, and that they expected that some who entered into this contract could not sell the required amount of goods and that they knew that the company could not make the goods which would be required if all the stock was sold to agents who could perform on their part. There is evidence that several others besides plaintiff bought stock and became district sales managers and employees of the company; in fact, the entire $100,000 of capital stock was disposed of in this way. These managers or agents were to be paid a salary of $250 per month on sales of $1,000 worth of goods, together with a commission of 10%, expense money and supplies. The proof tends to show that this would mean a selling expense to the company of at least 40%. The evidence shows that the manufacturing cost alone, that is, the cost of labor and material, was 66.53% of the amount of sales in 1906, and that, in 1907, the year plaintiff entered into this contract with the company, the manufacturing cost alone was 70.77% of the amount of the sales. It will be seen that the company could not carry out its contract with appellee without a loss on every sale. The manufacturing cost continued to increase and in 1909 had reached the point of being 136% of sales, which added to selling cost would amount to 170%, which means that, under the terms of the contract with appellee, it would cost the company $1.70 to make

and sell every dollar's worth of its goods. When we further take into consideration that the defendants were so anxious to sell stock and raise money that they were willing to pay Munroe $30,000 for selling stock amounting to $100,000, it becomes plainly apparent that the defendants knew the company was not making money, but was being operated at a loss each year, and that it must continue to do so. To induce investment in the stock, the company's contracts were made attractive by the promise of large salaries and commissions, together with a clause purporting to promise a repurchase of the stock at the price paid for it if the contract was canceled. The experience of plaintiff makes it plain that the company sought to evade this promise by hindering plaintiff in his employment so that he could not make a living wage, thereby causing plaintiff himself to sever his connection with the company as its employe. The officers and directors of the company, that is, the defendants, must be considered to have known that the company could not live up to the terms of its contract with plaintiff without such a great and continued loss that no concern could endure it, especially a company as weak financially as this was. Another circumstance tending to show that the defendants did not expect or desire that the plaintiff would prove a salesman who would work with profit to the company and himself is the fact that he was 65 years of age at the time the contract was entered into. It is not usual for successful manufacturing establishments to employ salesmen who have already reached the age at which many are forced to retire rather than continue in the active pursuit of business. This was much better known to defendants than to plaintiff. The charter of the company was to expire in 1911, so that when defendants planned in 1906 to offer such a contract, and when, pursuant to these plans, this contract was offered to and urged upon plaintiff in 1907, no power existed in this company to grant an extension for five

Myerhoff v. Tinslar, 175 Ill. App. 29.

years of this contract for three years, and the defendants must be presumed to have known that fact.

With the company's affairs in the condition above stated, defendants held an informal directors' meeting in June, 1906, at which was discussed the matter of selling stock. Munroe was present and said: "I do not know anything about your business, but if you want stock sold, I can sell it." A stockholder, named Potter, was present at this meeting and opposed such a method of selling stock, telling the others that it was not right; that it would jeopardize the standing of the company; that it would be practically impossible for such an agent, in a restricted territory, to sell $1,000 worth of goods a month, for his own sales as a general agent, covering the entire country, were only $14,000 a year, and that, if such agent could do such a volume of business, it would exceed the capacity of the plant. In reply he was told that "they did not expect all of them to make good." This indicates that defendants did not care so much to secure agents who would do a large volume of business, as they did to secure the money which would come to the company from the sales of stock. However that may be, at a formal directors' meeting on June 5, 1906, the officers of the company were authorized to make the proposed contract with Munroe for the sale of stock. It is in evidence that all of the defendants were present at this meeting and voted for this action. At this time there remained in the treasury, unissued, $50,000 worth of capital stock, but this stock was not turned over to Munroe for sale, but was divided among the then stockholders in the shape of a stock dividend, and then the capital stock was increased by another $100,000. These two stock dividends of $50,000 each were not based upon any increase in the value of the property, and the then stockholders paid nothing into the treasury of the company for it. It was simply watering the stock. It was a fraud upon any who bought any of the last issue of stock without knowledge of this

gift to the prior stockholders. In the statement to Dun & Company which plaintiff examined before he entered into this contract this watered stock was listed as "paid in cash." This deceived plaintiff, who had been expressly referred by defendants to Dun & Company for that information.

We conclude that plaintiff's $5,000 was obtained from him by fraud and deceit by means of the foregoing statements, representations and contracts, devised by Munroe for the purpose of bringing about sales of this additional capital stock of the company at prices far beyond the value of such stock, and adopted and authorized by the appellants, and that they knowingly authorized and became a party to all that was done, and that they are liable to plaintiff in this action for conspiracy, fraud and deceit, under the principles laid down in Miller v. John, 111 Ill. App. 56, and 208 Ill. 173, and in the authorities there cited. The contract of the company with Munroe, the various forms of contract which they authorized him to make, which were substantially alike except as to the amount of stock to be bought and salary to be paid, and the contract with plaintiff, were each competent as showing the nature of the scheme which defendants adopted and the manner in which it was to be and was carried out. The evidence of subsequent events was competent to show what the real value of this stock was and what the intention of defendants really was. The trial lasted about three weeks and it may be that not all rulings upon the evidence were exactly correct, but no substantial error appears in that regard.

We find no substantial error in the giving or refusal of instructions. It was proper to refuse the 44th instruction requested by appellants, because the statements made by the company to Dun & Company were false and were made for the purpose of deceiving any person to whom they might be communicated by Dun & Company, and plaintiff was requested by some of the defendants to make inquiries of Dun & Company,

and he did make such inquiries and obtained the information communicated by this false statement and was influenced thereby. We conclude that the case stated in the declaration and established by the evidence warranted the infliction of punitive damages and that therefore the giving of the 7th, 8th and 9th instructions was warranted, and therefore, if any such element entered into this judgment, it is not erroneous. Three of the defendants did not personally make false representations to plaintiff, but they approved and voted to authorize the steps which were afterwards taken and, having entered into the conspiracy with the other defendants to sell this stock in a manner and on a basis which was fraudulent and calculated to deceive, they are responsible for all that was done.

The verdict found "the defendants" guilty, without naming them. The judgment was against "the defendants," also without naming them. Defendant Eastburn was not served and did not enter an appearance. Appellants contend that this is a judgment against Eastburn and that it is void as to him and therefore must be reversed. In McCall v. Lesher, 7 Ill. (2 Gilm. 47), certain defendants had not been served and had not appeared. The record recited: "The parties come by their solicitors." It was held that this entry only embraced those previously before the court. In Pardon v. Dwire, 23 Ill. 573, a judgment against the defendants in an ejectment suit, where one of them had not been served, it was held that the judgment was proper as against the one served who appealed and simply void as to the other defendant, and that, if it had been rendered against defendant in the singular number, it would have been held applicable to the defendant who was served and who was making defense. In Gardner v. Hall, 29 Ill. 277, a case against four defendants, one of whom was not served, the clerk recited in the final order that the defendants appeared and it was held that this entry would be referred to those only who had been served. In Dawson v. Bridges,

19 Ill. App. 280, a suit against five defendants, two of whom were not served and did not appear, and the judgment was against the defendants, as here. It was held that the judgment was only against those who, by their own act or by the act of the law, had been made the subjects of jurisdiction. In 1 Freeman on Judgments, sec. 155, it is said that in all cases where the expression in the judgment is general, it will be confined to the parties served with process. That and other text books show that the rule is otherwise in some states. See also Hronek v. People, 134 Ill. 139 on pp. 146, 147.

We conclude that under the rule adopted in this state this is not a judgment against Eastburn.

Our rule 16, 137 Ill. App. 625, 626, requires that "The index must give not only the number of each exhibit and document in evidence, but must also name or describe it by its character, parties, date, etc., so as to distinguish it from every other exhibit or document in that record." The index to the abstract in this case is a gross violation of this important rule. It refers to 154 exhibits, introduced by plaintiff. Most of these are letters and it only uses the word "Letter," without any statement of the date and from whom and to whom it was written. Several of these exhibits are records of the corporation, but no date is given. Several are statements, but only that word appears. Several are contracts or forms of contract, but only the word "contract" is given. This index is of no value and we have been compelled to search the entire abstract to find any document desired. Many material matters are entirely omitted from the abstract or are insufficiently stated therein. We denied a motion to strike this abstract from the files, but we are satisfied now that we should have granted it. We call attention to this matter in order that attorneys may hereafter more fully observe said Rule 16.

Finding no reversible error in the record, the judgment is affirmed.

*Affirmed.*