**Wilhelmine Hough, Appellee, v. Commercial Wheat Growers Company et al., on appeal of Harry Fox, Wade Fetzer, Joseph J. Elias, George R. Wilson and Margaret H. Howell, Executrix of the last will and testament of C. D. B. Howell, Deceased, Appellants.**

### Gen. No. 23,179.

1. APPEAL AND ERROR, § 369*—*when inconsistent theory of case may not be advanced on appeal.* On appeal from a decree for complainant, in a suit against directors of a corporation for fraud and deceit in procuring the execution of a contract with their corporation, appellee's contention that appellants should be held personally liable because they were acting as directors of a foreign corporation, doing business in the State without a license, cannot be sus-

---

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

tained where it was not set up in the bill, no issue was made thereon and the case was not tried upon that theory.

2. CORPORATIONS, § 313a*—*when directors participating in non-feasance should be made parties in action by third person against other directors.* On a bill against the directors of a corporation for fraud and deceit in procuring the execution of a contract between complainant and the corporation, if defendants are held liable for nonfeasance rather than misfeasance, they are entitled to contribution, and all of the participating directors should be joined as parties defendant.

3. CORPORATIONS—*when directors are liable to third person for fraud in obtaining property.* As to a third person dealing with a corporation, the directors are merely agents of the corporation, their liability being the same, and if they participate or assist, knowingly or recklessly without knowledge, in obtaining property by fraud or deceit, they are liable to an injured person who relies upon their representations.

4. CORPORATIONS—*when directors deemed to have participated in fraud in procurance of contract.* Directors who, after knowledge of the fraud and deceit practiced to secure the execution of a contract with their corporation, refuse the request of the other party to return the money paid under it, must be held to have participated in the fraud and deceit.

5. CORPORATIONS, § 322*—*when contract between third person and corporations shown to have been procured by fraud and ratified by directors.* On a bill against the directors for fraud and deceit in procuring the execution of a contract between complainant and the corporation, evidence *held* to support a finding that the execution was procured by fraud and deceit and that the representations were known to and ratified by defendants.

6. CORPORATIONS, § 322*—*when authority of agent to act for directors in procurance of contract is shown.* On a bill against the directors for fraud and deceit in procuring the execution of a contract between their corporation and complainant, evidence *held* to show that the agent procuring the execution of the contract acted under authority from defendants, even though in so doing he substituted oral misrepresentations for written misrepresentations which he had been authorized to use.

7. CORPORATIONS, § 322*—*when representations by directors to third person as to financial condition of corporation shown to be fraudulent.* On a bill against directors for fraud and deceit in procuring the execution of a contract between complainant and their corporation, representations of defendants as to the financial condi-

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

tion of the corporation *held* to have been fraudulent and not a legitimate "puffing or boosting" of the corporation.

Appeal from the Superior Court of Cook county; the Hon. MARTIN M. GRIDLEY, Judge, presiding. Heard in the Branch Appellate Court at the March term,·1917. Affirmed. Opinion filed October 15, 1918. *Certiorari* denied by Supreme Court (making opinion final).

JOSEPH O. MORRIS and GARDNER, FOOTE & BURNS, for appellants; RANDALL W. BURNS and JOHN H. S. LEE, of counsel.

BUELL & ABBEY, for appellee.

MR. JUSTICE MATCHETT delivered the opinion of the court.

Appellants were the directors of a corporation organized in October, 1911, in the Dominion of Canada, under the Manitoba Joint Stock Company's Act.· By the decree appealed from they were held jointly liable with said corporation for deceit and fraud in procuring the execution of a contract with appellee, and were directed to return to her the sum of $8,375 obtained by the corporation under the contract.

The defendant corporation did not defend against the charges of fraud and does not appeal from the decree.

Although a Manitoba corporation, the general offices of the company were in Chicago, Illinois, and its business managed there. It was never licensed to do business in the State. Its capital stock was $100,000, of which $67,000 was preferred and $33,000 common stock. The common stock was owned by Thomas C. Kelly and William D. Blatner, who were the president and secretary, respectively, of the corporation, and who agreed to pay the company for their stock by services to be rendered by them. The preferred stock was sold for cash at par and the proceeds paid into the treasury of the company.

Kelly and Blatner, prior to the organization of the

company, made contracts for the purchase of certain lands in the Province of Saskatchewan, Canada, and these contracts were subsequently assigned to the company, of which Kelly was the moving spirit. The company bought other lands in the same province on contracts, by which it agreed to pay for the land partly in cash with deferred payments extending over a period of years. No deeds for any of the lands were delivered to the corporation.

On July 7, 1913, the corporation was engaged in the sale of these lands and in farming a portion of them. Appellants then and prior thereto were with said Kelly and one Thomas C. Moulding, the board of directors of the corporation. They actively took part in its business; they met regularly for the purpose of considering the same; and they were actively in the control and management of its affairs.

The contract with appellee was made on that date. It was in writing and is in evidence. By its terms it was agreed that the corporation should sell and appellee purchase a one-half section of this Canadian land for the sum of $16,000, $8,375 of the purchase price to be paid in cash and the balance to be paid from appellee's part of the crops which were thereafter to be grown upon the land.

The company agreed to cause the land to be broken up, cultivated and sown with grain upon the most approved methods of scientific farming, and to harvest, thresh and market the crops. From the net proceeds thereof, it was to retain 25 per cent and the remainder was to be applied to the payment of the unpaid portion of the purchase price of the land sold, with interest.

The contract also provided that the company should retain the control, management and right to cultivate the land until one year after payment of the purchase price. The company agreed to advance to appellee against her three-fourths of the crops, interest at the rate of 7 per cent per annum on the $8,375 in cash, which was paid by appellee upon the purchase price.

Appellee entered into negotiations which resulted in the making of this contract at the solicitation of B. H. Princell, a friend apparently, but in fact the agent of the defendant company. He introduced her to Kelly, the president. The negotiations were conducted at the Chicago office of the corporation. Appellee was induced to make the contract by reason of representations made by Kelly that the company owned the land free and clear of all incumbrances; that it was fertile, free from stones and ready for cultivation; that the directors of the corporation were men of high business and financial standing, and particularly that the corporation was financially able to carry out and perform all the terms and conditions of the contract.

Appellee was a widow whose husband died in November, 1911. She was inexperienced in business. She received from her husband's estate property to the value of $70,000. The income therefrom was her only means of support. She relied upon these representations. She did not see the land, nor make investigation in her own behalf.

The representations were false. The company did not have title to the land. It was in a semiarid region where the production of crops was not certain, but on the contrary, very uncertain. It was not free from stones, but on the contrary required the expenditure of large amounts for labor in removing the stones therefrom, and most important, the corporation was not financially able to carry out the contract with appellee, but was insolvent on the day the contract was made and had been insolvent prior thereto. A few months thereafter on a petition in which appellants joined, it was placed in the hands of a receiver by the courts of Canada and adjudged insolvent.

Appellants contend that the facts are not sufficient to prove fraud and deceit as to them personally. They claim that, if they are liable, it is only by reason of nonfeasance, and that the decree should therefore be reversed because it does not include Kelly and Mould-

ing, who on that theory of the case would be jointly liable with them and from whom they would be entitled to contribution.

Appellee contends that the facts establish liability in an action for misfeasance, not simply nonfeasance, and say that there can therefore be no contribution. Also relying on *Joseph T. Ryerson & Son v. Shaw*, 277 Ill. 524, appellee argues that appellants should be held personally liable because they were acting as directors of a foreign corporation, doing business in Illinois without a license from the State. This last contention, we think, cannot be sustained for the reason that no such cause of action appears to be set up in the bill of complaint, nor was issue made thereon, nor the case tried upon that theory. *Longley v. Wilk*, 171 Ill. App. 419.

We think it may further be conceded to be true that if appellants are held liable in this case for nonfeasance, rather than misfeasance, then although liable they would be entitled to contribution from each other, and it would, therefore, have been necessary to join all the directors participating. *Wallach v. Billings*, 195 Ill. App. 605. The case, however, is not one for nonfeasance. The decree finds:

"That the execution of the said contract by the said complainant, and the payment by her of the said sum of $8,375 was procured by fraud, which was known to or should have been known by the said defendants * * *; that the said last named defendants knew, or should have known that the said defendant company, in its then insolvent condition, could not have procured the execution of said contract and the payment of the said money by said complainant, except by representations to her that were false and untrue, and for which the said last named defendants * * * as directors of said defendant company were directly liable and responsible."

These findings of the decree are entitled to great weight. We have no right to set them aside unless they are clearly and manifestly wrong.

We have examined the evidence. We think it warrants the implication of intentional and conscious wrongdoing by these directors. As we understand the law, appellants, as directors of the corporation as to third parties, are simply agents of the corporation. Their liability to such parties is precisely that of any other agents. If they with knowledge, or recklessly without it, participate or assist in obtaining property by fraud or deceit, they are liable to the party injured who relies upon such representations.

At the time this fraud was consummated, appellants were the board of directors actively engaged in the affairs of the corporation. The business was not so large and extensive as to make it unfair to presume that there was some knowledge on their part of the transaction in question. The written record of their meetings and proceedings during the time of the negotiations with appellee are not in evidence. It appears that this important record had passed into the control of the courts of Canada in the insolvency proceedings. Apparently it was placed there with the consent of appellants, or some of them.

In the absence of this record there is oral evidence which tends to prove their misfeasance. Mrs. Hough was not able to pay for the amount called for by the contract in cash, but certain stock in a meat-cutter company was offered by her in lieu thereof. Kelly, prior to making the contract, took this matter up with some of appellants and it appears that a few days after the making of it, the board of directors, by affirmative action, consented to and ratified his action in inserting this provision in the contract.

In the same manner some of appellants were informed as to appellee's necessities in the way of a guaranty of the payment of interest at 7 per cent upon the part of the purchase price which she was to advance in cash. This was not a provision in the usual form of contract. It also was put up to appellants

acting as the board of directors of the corporation and the consent of the corporation was obtained through their actions.

Again there is uncontradicted evidence in the record that a few weeks after this money was obtained from appellee, her attorney laid the whole matter before the defendants and asked that they return at least in part the money which had been obtained from his client. This with full knowledge of all the circumstances, they declined to do. Appellants, therefore, by their affirmative action in refusing to return this money, with full knowledge ratified and approved the transaction as carried through. They must, therefore, be held to have participated in the undenied fraud perpetrated in the name of the corporation.

The most harmful misrepresentation was that made as to the financial condition of the company. It must have been clear to any one that if the corporation was insolvent, or even in financial difficulties, appellee's contract would be of little value to her, and most of the benefits which she was supposed to obtain under it could never be received and the money paid lost.

Appellants had knowledge of the financial condition of the company. They knew its inability to carry out the contract. It had been refused credit. Suits for unpaid bills were threatened and the company had, in fact, been for months insolvent.

The attention of appellants had been directed to the financial condition of the company and an audit made March 31st prior to these negotiations. Appellants say they cannot be held responsible for the reason that this audit of the company's books was made by a reputable and capable firm of certified public accountants and that it showed the company to be in a solvent condition.

The financial condition of the corporation, however, was a matter to be determined from analyzing the report, rather than from the balance as shown by it. It

was not the figures, but the facts underlying the figures, which would determine that question. These facts were the things which the directors of the corporation knew, or, being in active control of the business, were presumed to know. The auditing committee did not have such knowledge.

It is also to be noted that the representation upon which appellee relied amounted to a statement not only that the corporation was solvent, but more than solvent.

Appellants say that the evidence fails to prove authority from them to Kelly to make the oral representations by which appellee was induced to part with her money. No one of appellants talked with appellee prior to the making of the contract; they did not know her personally, nor did she know them personally. Does the evidence show that Kelly had authority from appellants to make these false representations? We think it does.

There appears in the evidence certain pamphlets, pictures and literature which for about 2 years had been used by agents of the company in making sales of its lands. There is evidence in the record proving that appellants had knowledge of this literature and the use to which it was put. This appears from an examination of the additional abstract of the record filed by appellee. In one of these pamphlets, complainant's exhibit "4," appears the names of each of appellants with a single exception. It was used by their authority.

The examination of these pictures and literature shows that with the possible exception of title, every other misrepresentation upon which appellee relied is contained therein. The evidence shows that this literature, etc., was used by Kelly at the time of negotiating the contract in question. He handed it to appellee, but her eyesight was poor and she did not read it. Under these circumstances we think appellants cannot be heard to deny their authorization of the false repre-

sentations and their responsibility for them, at least in so far as they were similar to the written misrepresentations which were contained in this literature. As we view it, they authorized the agents of the company to make these misrepresentations in writing, and the directors who so authorized them cannot escape liability because, by reason of a partial blindness of the person to whom the representations were made, the agent substituted for the written, similar oral misrepresentations.

Appellants say that assuming the directors knew the contents of these writings, that no "misrepresentations other than boosting and puffing were contained therein." The literature was evidently carefully prepared for the purpose of avoiding direct representations of fact, yet the effect of the whole of it was to convey such false representations.

As the question of the financial condition of the company was the most important representation, we quote as bearing on that subject this excerpt from the pamphlet labeled, "Wealth from Wheat" under the heading of "Safety and Income:" "Safety and Constant Income are the primary factors to be considered in the investment of Savings Funds. The Unit System of Wheat Land Ownership provides a *safety* and *stability* that could scarcely be excelled. For each Unit represents a fixed number of acres of actual land —that business depression cannot shrink, fire destroy or winds blow away. It represents the most *productive* of land—land adapted by nature to the most profitable of crops. It represents land cared for and cultivated by a permanent organization, that neither death nor disability can affect, that adversity cannot handicap—that works unflaggingly day in and day out because it is a *corporation* and not a man.  *  *  * Invest in Wheat Land. Invest now while you can. Invest under the *system* that provides you *profits* while it relieves you of the entire risk and responsibility."

There is something of legitimate ''puffing and boosting'' in this literature, yet we think the characterization of this corporation as a ''permanent organization, that neither death nor disability can affect, that adversity cannot handicap'' at least implies the statement as a fact that it is in a solvent financial condition.

We think these directors were guilty of conscious wrongdoing in taking appellee's money at a time when they, to say the least, knew that the financial condition of the corporation was precarious. We think they were again guilty of conscious wrongdoing when with full knowledge of the situation they refused to return to appellee even a part of the money which had been wrongfully taken from her. Neither in morals nor, as we think, in law can they escape responsibility. Our views are sustained, as we think, by the following authorities: 2 Thompson Corporation (2nd Ed.), par. 1301; *Donovan v. Purtell*, 216 Ill. 629; *Edgington v. Fitzmaurice*, L. R. 29 Ch. Div. 459; *Morgan v. Skiddy*, 62 N. Y. 319; *Meyerhoff v. Tinslar*, 175 Ill. App. 29; *Miller v. John*, 208 Ill. 173; *Hubbard v. Weare*, 79 Iowa 679.

The decree of the Superior Court will be affirmed.

*Affirmed.*