## Jacob Auman et al., Appellants, v. Perry W. McKibben, Appellee.

### Gen. No. 5,739.

1. FRAUD—*statements as to value.* Statements as to the value of a business or of property made to induce one to buy or invest money, are as a general rule treated as expressions of opinion, and if so intended and understood do not constitute fraud, in the absence of any concealment or misrepresentation of material, extrinsic facts.

2. FRAUD—*false statements as to value.* False statements as to value of corporate stock by defendant, having superior means of knowledge, made to induce complainant to trade his store for it, constitute fraud.

3. TENDER—*where sale is rescinded for fraud.* A statement, in a bill to rescind a sale for fraud, that complainant offers to deliver up the shares of stock and money received as consideration, is a sufficient tender.

4. APPEALS AND ERRORS—*when error is not raised in lower court.* On a bill to rescind a sale for fraud, the question whether complainant made sufficient tender of return of the consideration cannot be raised for the first time in a court of review.

5. PARTIES—*bill to rescind sale.* On a bill to rescind a sale for fraud, a third person to whom shares of stock were delivered to be held for complainant, need not be made a party to the suit

where it appears on the trial that the shares are in complainant's possession.

6. FRAUD—*when contract rescinded for.* Where it appears on appeal that defendant, representing he would pay complainant part cash for a store and furnish certain valuable stock as collateral for the remainder which he would be able to pay a month later, induced complainant to sign a bill of sale when the stock was practically worthless and defendant did not intend to pay the remainder of the purchase price, a decree dismissing the bill for want of equity will be reversed and remanded with directions to enter a decree rescinding the sale.

Appeal from the County Court of Stephenson county; the Hon. OSCAR E. HEARD, Judge, presiding. Heard in this court at the October term, 1912. Reversed and remanded with directions. Opinion filed April 8, 1913.

R. R. TIFFANY and R. P. ECKERT, for appellants.

WILLIAM N. CRONKRITE and ELWYN R. SHAW, for appellee..

MR. PRESIDING JUSTICE DIBELL delivered the opinion of the court.

Jacob Auman owned a store building in Kent in Stephenson county and lived over the store and in rooms attached to or adjoining the store. He and his son, George, conducted a general country store in the store part of the building, with a stock of dry goods, groceries, boots and shoes, etc. George wished to return to farming and Jacob did not feel able to conduct the store alone. For that reason they wished to sell the stock of goods, and placed it for sale in the hands of Sheridan, a real estate agent in another town. On July 22, 1909, Sheridan introduced to them Perry W. McKibben as a prospective purchaser, and A. L. Wolfe, and then went away on other business. Before the close of the day, a contract was made for the sale of the goods by the Aumans to McKibben at the invoice price, except as to shopworn goods, and for the sale of those at the price at which appraisers should fix

their value. Each party was to select one appraiser and they a third if necessary. One hundred dollars was paid down on that day. McKibben came with his appraiser on July 26, and four days were spent in making the appraisement and, after excluding the feed, located in another building, and which McKibben concluded not to buy, the price was fixed at $4,410, and a certain payment was made and the store was surrendered to McKibben, who had also taken from Jacob Auman a lease of the building under date of July 26. Very soon after taking possession McKibben began to box up the goods. Kent is on the Chicago & Great Western Railway, and McKibben ordered a car to Kent to be billed to Dubuque, Iowa. The Aumans became alarmed, concluded they had been defrauded, went to the county seat during the night, employed counsel, prepared and filed a bill in equity for the rescission of the contract on the ground of fraud, and obtained an injunction restraining the removal of the goods, which was served at noon of the following day. McKibben answered and moved to dissolve the injunction. Many affidavits were filed, the motion was heard, and the trial judge permitted McKibben to file a bond and take away the goods. They were then removed to Waddams Grove and afterwards to Warren and were there sold. Amendments were filed to the bill, the answer was extended to the bill as amended, the cause was referred to a master, who took and reported the proofs, and there was a hearing and a decree dismissing the bill for want of equity, from which decree the Aumans prosecute this appeal.

We conclude that the following facts are established by a preponderance of the evidence and the more material matters by a clear preponderance of the evidence.

Kent is a village of about 100 persons in a farming community. The Aumans were Pennsylvania German by descent; had had a mere country common school education; had been farmers most of their lives; and

were obviously unacquainted with the sharp practices of the business world. Appellee was a shrewd business man, who had traveled far and wide. He had been a number of years a traveling salesman for the Elliott Manufacturing Company, a corporation located at Warren on the Illinois Central Railroad in said county, engaged in the manufacture and sale of anti-rust and heavy tinware. He had ceased to be in their employ and was traveling for another corporation at the time in question. He lived at Warren, and so did A. L. Wolfe whose business was selling Western lands, incandescent lamps and fire insurance. Appellee ostensibly brought Wolfe to Kent with him to value the stock of goods, but Wolfe had no experience which specially fitted him to perform that office. Appellee and Wolfe looked casually at various articles of merchandise in the store and praised the stock. They examined the book showing the amount of daily sales and professed to be surprised and pleased. They inquired into the financial responsibility of the farmers in that neighborhood who were the patrons of the store. Wolfe took the opportunity when he had George Auman on one side to tell him that appellee was a man of means and able to pay cash. Appellants stated that they would sell for cash, if they could get their price. Appellee tried to get them to offer to sell at a lump sum. Appellants refused to sell, except at the invoice price, which George Auman said would be $5,000, or more, and in which he was correct, as the invoice showed that the goods finally sold, and the feed, which was not sold, invoiced over $5,000. Appellee professed himself satisfied with the goods, with the store and with the method proposed for invoicing. He stated that he was buying for the purpose of placing his son-in-law there because dissatisfied with his manner of life. He stated that he wished to get his son-in-law into business in a quiet place where he could not get

anything to drink. Appellee said that if he bought, he should remove the post office which was in the store, and should fill up that space with $1,800 worth of new goods. He ascertained what Jacob Auman would charge him as rent for the building, and said the rent proposed was reasonable, and he should rent it if he bought the goods. He said his son-in-law had a large piano and asked how they could get it upstairs. He asked permission to redecorate the store, and was told by Jacob that he could do so if he did not injure the building. He stated that he should remove the wooden awning and wooden sidewalk in front and replace the latter with cement. Up to this time all talk had been upon a cash basis. After everything had been orally agreed to, he told appellants that as he would have to expend $1,800 for new goods (though one to two witnesses put this at $1,200), and intended to decorate the store at considerable expense, he could not pay all cash at once; that he had $4,000 coming in on the first day of September, and that he would pay $100 down and as soon as the invoice was completed he would pay all but $4,000 at once, that he would deposit with them certificates of the capital stock of the Elliott Manufacturing Company of the par value of $4,000, as collateral security for the payment of said $4,000 on the first of September. He produced certificates of that stock, aggregating the par value of $4,000. Appellants told him that they knew nothing about the value of this stock. He told them that it was as good as gold, that it was worth one hundred cents on the dollar and was salable at that price at any bank; that the gold seal upon the certificates, or one of them, was evidence that the State of Illinois stood behind it; that he would not sell it at any price and would only put it up as collateral upon having from them a written contract binding them to deliver back to him these certificates upon his paying the $4,000 on September first. He called upon Wolfe to verify these statements by him as to the value of

this capital stock, and Wolfe gave assurances support-
ing him. These assurances were repeated in many
different ways in response to repeated statements by
appellants that they knew nothing about the Elliott
Company or the value of these certificates. When Mrs.
Jacob Auman protested that they knew nothing about
the value of those shares, he assured them that he
would not rob them or deceive them. He also said to
them that they were going to have as security for the
$4,000, not only the shares of stock worth $4,000, but
also the merchandise which they had told him would
inventory $5,000, and also the $1,800 of new goods
which he was going to put in, making in all $10,000
worth of security, and he asked what more they could
want as security. The proof shows that appellee was
a very smooth, persuasive and constant talker. They
finally agreed to accept the shares of stock as collateral
security. Appellee then proposed that Wolfe draw the
papers. Appellants insisted that the papers should be
drawn by their neighbor J. F. Keister, a farmer and a
justice of the peace. When appellee found that appel-
lants would not consent to let Wolfe draw the papers,
he consented that they be drawn by Keister. George
went and brought Keister. The bargain was stated to
him as we have above stated it. Wolfe produced
printed blanks, which he had brought with him. Wolfe
and Keister sat at a table and Wolfe dictated what
should be erased from the printed blanks and what
should be inserted, and Keister wrote at his dictation.
While this writing was being done, appellee kept ap-
pellants engaged in conversation. At one place Keis-
ter told Wolfe that it seemed to him that he was mak-
ing appellants buy these shares of the Elliott stock,
but Wolfe assured him that he was doing no such
thing; that the stock was not for sale and that they
could not buy it; and Keister thereupon went on writ-
ing as directed. After the papers were finished Wolfe
read them aloud and they were signed. Appellant then
placed these certificates of the Elliott stock in the

hands of Keister and said to him that he should lock up these certificates in his safe and give them back to him when he paid the $4,000 on September first. Appellee then asked that the store be locked up and he be given the keys, but this was refused because of the post office. Appellee and Wolfe then went away. The time was fixed when appellee should return for the invoicing. One contract executed on July 22, headed "Earnest Money Contract of Sale," described the consideration as "The sum of amount goods will invoice dollars ($..........) on terms as follows: Dollars ($100.00) in hand paid as above and $4,000 secured by 40 shares of stock in the Elliott Manufacturing Company of Warren, Illinois, of the par value of $100 each and the balance of invoice to be paid in cash at the time invoice is complete, payable on or before the dates as named above." A bill of sale then executed contained no reference to the shares of stock but described the consideration as "The sum of amount goods will invoice dollars." A third paper then executed was an option contract, describing these shares of Elliott stock, and thereby Jacob Auman agreed to hold them till noon of September 1, 1909, and to deliver them subject to the order of appellee or his assigns upon receiving $4,000, and if appellee did not exercise that option by the date named he was to forfeit $5. These papers therefore were inconsistent. The so-called "earnest money contract" said that $4,000 of the purchase price of the merchandise was secured by the 40 shares of Elliott capital stock, while the option contract made Jacob Auman the owner of the shares unless appellee chose to exercise an option to buy them by the first of September. Appellants did not have a copy of the option contract till July 26.

The Elliott Manufacturing Company had a small plant, employed 20 or 30 men, besides sales agents traveling in the northwest. It had paid no dividends since 1906. Appellee introduced proof that the Company paid a dividend in 1907 and paid dividends in

1911 and 1912, since the commencement of this suit, but appellee finally conceded in his testimony that it had paid no dividends since 1906. This capital stock was not worth one hundred cents on the dollar; it was not as good as gold; it was not salable at any bank for any sum, and it had no market value. The State Bank of Warren was the bank where the Elliott Company made its deposits and borrowed money, and these particular shares of stock had been in that bank for a number of years as collateral for loans it had made to appellee and had extended and increased from time to time, and it was its insistence that appellee should take up these certificates and reduce his indebtedness to the bank which led to the transactions involved in this suit. Carson, cashier of that bank, testified for appellee in chief that these shares were worth from seventy-five to one hundred cents on the dollar. Upon his cross-examination it was clearly developed that he possessed no information which would justify him in that statement; that in fact the shares had no market value and that he himself would not give ten cents on the dollar for them. The Elliott Company apparently could not borrow more money, and it had issued preferred stock for the purpose of raising money. It was a going concern, and its stock might some day have a market value, and conservative estimates fixed its probable value at that time at ten to fifteen cents on the dollar. It had no resemblance to the "cash" for which appellants orally agreed to sell and which appellee orally agreed to pay.

Within the two months last preceding this transaction, appellee had made at least three efforts to unload this capital stock in three other villages in the surrounding country. He first tried to sell this capital stock for a stock of merchandise. At another place he tried to buy a livery stable and at still another a stock of merchandise, and in each of these last two cases he proposed to secure payment in cash at a later

date by a deposit of these 40 shares of Elliott stock, at one of them on September first, when he would have $4,000, and at the other place in six months. In each case he either went attended by Wolfe or Wolfe appeared while the negotiations were pending. In each case his excuse for buying was his desire to get his son-in-law into business in a quiet place, free from certain allurements and temptations.

In fact, it is clear that appellee did not intend to operate a store in Kent, either personally or by his son-in-law. When he took these certificates from the State Bank of Warren, just before he went to Kent, he agreed to transfer his interest in the goods immediately to the bank. He claims that he agreed to give the bank a chattel mortgage upon the goods, and that, after the preliminary transaction, the attorney for the bank insisted on a bill of sale. He did execute a bill of sale forthwith to the bank. He assigned his lease of the building to the bank four days after he received it from Jacob Auman. He claims it was the bank that sought to remove the goods, but he was the one who attended to the boxing of the goods and who had ordered a car to be loaded for Dubuque. He now claims that when the car reached Dubuque, it was to be sent to Warren over the Illinois Central. We regard it as clear that all his praise of the quality of the merchandise, his inquiry into the financial responsibility of the people who traded at the store, his taking a lease of the premises for one month with a privilege of twelve, his statement that he should put in $1,800 worth of new goods, and many other things which he said and did on the 22nd of July, which we have not set out, were merely blinds to gain the confidence of appellants and get this capital stock into their possession in such a way that it would in fact be applied at par as a payment upon the merchandise, which merchandise the proof shows was worth all appellee agreed to pay for it, besides the good will of the business.

We are not unmindful that the evidence is conflicting. Appellee and Wolfe testified that appellee offered the stock in payment for the goods and that appellants accepted it as such payment, and that no suggestion was made that it be left as collateral security for $4,000 in cash to be paid on September first. Not only is there a clear preponderance of oral evidence against appellee on this subject, including the testimony of disinterested witnesses, but there are many circumstances that dispute this claim. If appellee's contention is true, and if, as appellee and Wolfe claim, there was no suggestion that $4,000 in cash would be paid appellants on September first and that the certificates of stock should be deposited as collateral security for such payment, how did it happen that in the "earnest money contract" a part of the consideration was put in writing as $4,000 secured by 40 shares of stock in the Elliott Company of the par value of $100 each? The testimony of appellee and Wolfe furnishes no answer. Appellee claims that he took the option contract because he did not like the secretary of the Elliott Company, and he hoped that that secretary would soon be removed, and then he might wish to again become traveling sales agent for that company, and might wish to own some of this stock. But there are no facts shown to support that claim, and we think it the more reasonable to conclude that it was an afterthought. In several important respects the testimony of appellee is inconsistent with the statements made in his answer, which was also under oath.

It is contended here that what appellee and Wolfe said as to the value of this stock was mere puffing, in which the law permits the seller to indulge. The parties were not upon an equal footing. Appellee and Wolfe were men of much better education than appellants and had a very much wider knowledge of business transactions than did appellants. Appellants were unacquainted with corporate transactions and with the Elliott Manufacturing Company, except that

the proof seems to show that a relation of George Auman's wife worked for the Elliott Company. Neither of appellants had ever seen a certificate of stock before, nor had either of them ever heard of the Elliott Manufacturing Company before, though they had heard that there was a tin factory at Warren. Appellee lived in Warren, had worked for the Elliott Company several years, had held these shares of stock several years, knew that the company did not pay dividends, knew that in repeated efforts he had been unable to dispose of the stock either at a sale or as collateral security, and undoubtedly knew that it had no salable value and that it was not as good as gold and was not worth one hundred cents on the dollar or anything like that. We are of opinion that the rule stated in Biewer v. Mueller, 254 Ill. 315, on page 323, is applicable here:

"The property about the misrepresentation of the value of which complaint is made, was not the property directly involved in the trade. It was collateral to the principal transaction, part of whose terms it was designed to secure, and the representation was made, not to induce the appellees to purchase the property, but to accept it as security. The general rule is, that statements as to the value of a business or of property, made to induce one to buy or invest money, are treated as expressions of opinion, only, and if so intended and understood do not constitute fraud, in the absence of any concealment or misrepresentation of material, extrinsic facts. 'The reason of the rule is that such statements are expressions of opinion; but where they are made with the intention that they shall be understood as statements of fact, and not as the expressions of opinions, they will constitute fraud.' (Leonard v. Springer, 197 Ill. 532; Murray v. Tolman, 162 Ill. 417; Allen v. Hart, 72 Ill. 104.) The false statement of value was here made by Mueller, having superior means of knowledge, and was relied upon as a matter of fact and not opinion. It constituted fraud,

which violated the agreement entered into partly in reliance upon it." See also Miller v. John, 111 Ill. App. 56.

It is contended that appellants should have made a formal tender to appellee of the $410 received and of these certificates of stock, before filing this bill. In the bill complainants said: "Your orator hereby offering to deliver up the said certificates for the said 40 shares of the said capital stock of the said company and the assignments thereof and the said lease and to repay to the said McKibben the sum of $410, paid to your orators by the said McKibben." We think this a sufficient tender, and, if not, the point was not raised in the court below and cannot be raised here for the first time. It is urged that Keister was a necessary party because, according to the testimony of appellants, the stock was delivered to him and is perhaps in his control. This point was not raised below; and complainants offered the certificates in evidence and therefore had them in their apparent control. The record includes the written opinion of the trial judge, and it there appears that he found as we have done on all questions of fact, except that he did not conceive that complainants had sufficiently shown the lack of value of the Elliott stock. We are of opinion that under the proofs not only were the representations concerning the value of the Elliott stock false and fraudulent, but also that, if the stock were of substantial value, still appellants sold the goods and appellee bought them upon his agreement to pay $4,000 in cash therefor on September first, and that appellants were deceived and defrauded by the form which Wolfe, the agent of appellee, caused the writings to assume, and that appellee did not intend to pay $4,000 for these goods on September first, nor at any other time, and that he had no money due to him on September first, from which he could have made such a payment.

The decree is therefore reversed and the cause is re-

manded with directions to enter a decree rescinding the sale for fraud, requiring appellants to surrender the certificates of stock to appellee, giving credit to appellee for the $410 paid, and as appellee has sold the goods and hence cannot return them, giving to appellant a decree against appellee for $4,000, (to be paid after the certificates are returned to appellee,) with interest thereon at five per cent. per annum from July 29, 1909, the day when appellants surrendered possession of the goods to appellee.

If Keister holds the certificates of stock and will not surrender them, appellants should be given the right to bring him in as a party before the decree is entered.

*Reversed and remanded with directions.*