## J. P. HAMILTON v. F. M. GALBRAITH.

Eastern Section.   May 27, 1932.

Petition for Certiorari denied by Supreme Court, October 22, 1932.

J. N. Moore, of Knoxville, for appellant.

Frantz, McConnell & Seymour, of Knoxville, for appellee.

FAW, P. J.  The bill in this case was filed on January 8, 1931, in the Chancery Court of Knox County, by J. P. Hamilton, a resident of Knox County, Tennessee, against F. M. Galbraith, a resident of the same State and County.

It appears from the pleadings and proof that, by deed dated December 18, 1930, and acknowledged and delivered December 20, 1930, complainant conveyed to defendant a farm of one hundred and nine acres of land in the 14th District of Knox County, Tennessee, which land is fully described in the bill, and also certain live stock, farm tools and implements, corn and hay on said farm, for the consideration of $95 in cash and the assignment (without recourse) and delivery to complainant of ten notes, aggregating $7022.16, executed by the Yellow Cab Coach Company, a corporation having its principal office at Maryville, Tennessee, and operating a bus line between Maryville, Cleveland and other points, and for the further consideration of the assumption by defendant Galbraith of encumbrances on said farm to the amount of approximately $4,355.

At the time the bill was filed, complainant was still occupying the residence on said farm, and the personal property conveyed as aforesaid was still there, but said personalty was in the possession and under the control of a tenant of defendant.

Complainant sought by his bill to obtain a rescission of said sale and conveyance on the ground that defendant had induced complainant to sell and convey said property to defendant by means of false and fraudulent representations with respect to the value of the said notes made by the Yellow Cab Coach Company.

Complainant alleged in his bill that defendant represented to complainant that said notes were perfectly good and well secured and that said Company was worth $50,000 and was making money; that these representations were entirely untrue; that the Company was heavily in debt and losing money every month in the operation of its business and confessed its bankruptcy in a bankruptcy proceeding instituted against it on the 30th day of December, 1930; that since the failure of said Company complainant had discovered that instead of

his notes of $7022.16 being the only notes against the three coaches to which title was retained to secure said notes, there was outstanding about $21,000 of serial purchase money notes against said coaches, all sharing equally in the security.

Complainant charged, upon information and belief, that said security was worth less than $5000, and he could not hope to get as much as $1000 out of proceeds of said securities when wound up and administered.

Complainant further alleged that defendant was thoroughly familiar with the insolvent condition of said Company and took said notes for the purpose of trading them quickly on representation of the Company's solvency and without personal recourse, in anticipation of the Company's bankruptcy.

It is further alleged in the bill that in the course of the negotiations with complainant, defendant declared his purpose and intention to keep the farm, but he began at once to try to sell it, offering it for $10,000.

Complainant states in his bill that he "files all of said notes with his bill in this cause subject to the orders of the Court and offers to pay into Court or to the defendant the sum of $95 cash paid to him by the defendant, upon order of the Court.

After the usual prayer for process and waiver of answer under oath, complainant prayed that a writ of injunction issue enjoining and inhibiting the defendant from selling or disposing of any of the property described in the bill and from interfering with complainant's possession and control thereof; that on the hearing said deed and sale be declared void as having been obtained by fraud of the defendant; that all right, title and interest of the defendant in and to said properties be divested out of him and vested in complainant; that if necessary a receiver be appointed to take possession of said properties pending this suit, and that complainant have a decree against the defendant for all costs of this cause and for all damages complainant may sustain on account of said fraudulent acts. Complainant also prayed for general relief, and stated that this is the first application for an injunction in this case.

Pursuant to a fiat of the Chancellor, a temporary injunction as prayed for was issued and served on the defendant.

Defendant answered the bill on January 27, 1931, and in his answer admitted the conveyance to him by complainant on December 18, 1930, of the land and personalty described in the bill, but defendant denied that he "ever induced the complainant" to sell and convey said property to him. Defendant stated in his answer that for some days prior to December 18, 1930, defendant had been in negotiations with the complainant for the purchase of said farm, and that he finally made an agreement with the complainant by which

162

the notes described in the bill were traded to complainant for complainant's equity in said farm, the notes having been endorsed without recourse.

Defendant stated further, in his answer, that it is not true that he made any representations whatever to complainant as to the solvency or value of said notes, but that complainant made an investigation of the notes on his own part before accepting same; that defendant made no statement to complainant as to the condition of the Company, but simply offered to exchange said notes for complainant's equity in said farm, and waited until the complainant satisfied himself with respect to the value of said notes; that after the complainant had made his investigation, or said he had, the trade was made openly and fairly, no advantage whatever was taken of complainant nor attempted to be taken of him; that complainant was represented in the matter by a real estate agent who conducted most of the negotiation and, as defendant is informed, a part of the investigation of said notes; that defendant is not advised as to the present value of said notes and was not advised at the time of said trade as to their value; that defendant did not know the fact, if it be a fact, that the Company was insolvent or in any business troubles at that time, and he does not know now what the financial condition of said Company is and was; that defendant owned said notes, the complainant desired to trade his equity in the farm for the notes, and after full negotiations the trade was openly and fairly made between them, and the farm was conveyed to complainant, and defendant assumed a mortgage on the same to the Prudential Insurance Company for the sum of $4,355 which he is now arranging to pay.

Defendant further stated in his answer that it is untrue that he immediately began to sell said farm; that he has made no efforts to sell the same; that he, of course, would be willing to sell it if high enough price were offered, but he is advised that it is wholly immaterial to this controversy what he intended or intends to do with the same.

Defendant specifically denies that he or anyone representing him or authorized to speak for him has been guilty of any manner or character of fraud in said transaction. He alleges that his trading was openly and fairly done; that the complainant had the fullest opportunity of investigation and claimed to defendant that he had made investigation as to the value of said notes before trading for them. Defendant denies that he has been guilty of any misconduct in the transactions between himself and the complainant, and denies that he has made any representations whatever to the complainant of the character described in the bill, and he denies that the complainant is entitled to a rescission of said contract or to any relief whatever as prayed in the bill.

Proof was taken and filed, in the form of depositions of witnesses and exhibits, on behalf of the parties, respectively, and on final hearing the Chancellor pronounced a decree, which was entered on October 27, 1931, dissolving the temporary injunction, and adjudging and decreeing that the allegations of the bill, which are denied by the answer, are not supported by the proof in the cause; that there is no sufficient proof of fraud or deceit to entitle the complainant to a rescission of the contract as sought in the bill. The Court thereupon dismissed the complainant's bill and adjudged that defendant recover of the complainant all of the costs of the cause, for which execution was awarded.

Complainant Hamilton prayed, obtained, and perfected an appeal to this Court and has here filed a single assignment of error, as follows, viz:

"The Court erred in decreeing that the allegations of the bill are not supported by the proof and that there is no sufficient proof of fraud or deceit as to entitle complainant to a rescission of the contract as sought in the bill."

The issues presented for decision are (1) whether, in the course of the negotiations between the parties, defendant made false representations to complainant (as charged in the bill) with respect to the financial condition of the Yellow Cab Coach Company and the value of the notes executed by it which defendant subsequently traded to complainant; (2) whether complainant relied upon the representations of defendant, and was thereby induced to accept the notes of the Yellow Cab Coach Company for $7,022.16 as the consideration pro tanto for the conveyance of his farm, and (3) whether the complainant has done, or can do, all that settled principles of equity jurisprudence require in the way of restoring the defendant to the status occupied by him immediately before the contract and conveyance which complainant is seeking to rescind.

According to the testimony of the receiver of the Yellow Cab Coach Company, appointed by the Bankruptcy Court, the assets of that Company are worth "around $2,250" and its liabilities are "around $25,000." On the whole record, we find no good reason to discredit these estimates of the receiver. It is obvious, therefore, that complainant cannot hope to collect as much as ten per cent of the face value of the notes in controversy. In other words, these notes, aggregating on their face $7,022.16, are comparatively worthless, and were so at the time they were transferred by defendant to complainant (December 20, 1930), as the Company was adjudged a bankrupt ten days thereafter, viz: on December 30, 1930, and there is no evidence of any radical change in its condition in the interim.

The Yellow Cab Coach Company was incorporated in December, 1928, and operated a passenger bus line from Maryville, via Madi-

sonville and Cleveland, to Chattanooga until October 1, 1930, when it sold that part of its line between Cleveland and Chattanooga, with two busses, for $20,000, and thereafter operated the remainder of its line, viz: from Maryville to Cleveland, until it was adjudged a bankrupt on December 30, 1930.

From the organization of the Company in December 1928, until October 1, 1930, defendant F. M. Galbraith owned one-half the stock of the corporation and was its Secretary-Treasurer and its bookkeeper. He prepared the income tax report for the year of 1929 which showed that, instead of an income, the Company had sustained a loss of approximately $3,200 during that year. It also appears that the $20,000 received as the purchase price of the aforesaid line from Cleveland to Chattanooga and two coaches was promptly disbursed by the Company in the payment of debts, including salaries to its officers which were largely in arrears.

Defendant severed his connection with the Yellow Cab Coach Company on October 1, 1930, both as an officer and as a stockholder. In his testimony he refers to the fact that he ''sold out'' on that date, but the record is singularly silent as to the name or names of the purchaser or purchasers of his stock and the price and terms of the sale.

On October 3, 1930, the Yellow Cab Coach Company executed thirty promissory notes, aggregating $21,000, payable to A. D. Galbraith, a brother of the defendant. These thirty notes were renewals of notes previously executed for the purchase price of three passenger busses, and they purported to retain title to said busses until payment of the notes. It was ten of this series of thirty notes that defendant traded to complainant, said notes having been previously assigned and transferred ''without recourse'' by A. D. Galbraith to defendant F. M. Galbraith, both of whom testified that A. D. Galbraith traded said notes to F. M. Galbraith for the latter's interest in the ''home place'' of their father—a farm of three hundred and twenty acres in Knox County—which A. D. Galbraith said was a one-fourth interest and F. M. Galbraith said was a one-third interest. No deed of conveyance or memorandum in writing evidencing a sale by defendant to A. D. Galbraith of defendant's interest in his father's ''home place'' was introduced or offered in evidence, and it seems from testimony elicited by cross-examination of A. D. Galbraith and defendant that their father was then living and the ''interest'' of defendant in his father's farm was, therefore, a mere expectancy, as it is a clear inference from the record that defendant's father had not conveyed to defendant an interest in said farm.

Defendant Galbraith is forty-one years of age and his deposition indicates that he is a man of intelligence in business matters—apparently the superior of the complainant in that respect, the latter being

seventy years of age and seemingly illiterate, and with no more business experience than is ordinarily incident to the life of the average small farmer. He had lived for eleven years on the farm of one hundred and nine acres which he conveyed to defendant, and he had no other property except a small amount of personalty on said farm.

In view of defendant's intimate contact with the business and operations of the Yellow Cab Coach Company as its Secretary-Treasurer and bookkeeper from December, 1928, to October 1, 1930, a finding that he did not know whether said Company was solvent or insolvent, and did not know whether it was making or losing money, would be a reflection upon his intelligence not justified by the record, and would strain our credulity to the breaking point.

The negotiations which culminated in the conveyance involved in this case covered a period of about five days, that is to say, they begun on Tuesday, December 16, 1930, and were concluded on Saturday, December 20, 1930. Complainant and defendant had no previous personal acquaintance, and complainant had no previous knowledge of the Yellow Cab Coach Company. J. M. Leek, a Knoxville real estate broker, initiated the negotiations on December 16, 1930, by asking defendant (whom Leek met for the first time on that date) if he would be interested in trading for a farm, and, upon receiving an affirmative reply, Leek and defendant went, in company with A. D. Galbraith, to complainant's home, and defendant "looked over the farm" in question, but no proposition was made by or to complainant in person on that day. However, on the return trip to Knoxville, defendant told Leek that he would be interested in a "deal" upon the basis of $11,000 for the farm and certain personal property, if he could trade to complainant the series of notes in controversy.

It should be stated here that Leek had been endeavoring for two years or more to find a buyer for complainant's farm, pursuant to a parol proposition by complainant that complainant would pay him (Leek) a commission if he would sell said farm, and, in response to a question by defendant, Leek informed defendant while they were on the return trip from their first visit to complainant's home, that he (Leek) would look to complainant "to settle the commission." It further appears that complainant did not question his liability to Leek for commissions on the sale and "satisfied" Leek therefor. We find, therefore, that, as between complainant and defendant, Leek was the agent of complainant in procuring a purchaser for complainant's farm, and did not represent defendant in the transaction.

On Wednesday, the next day following their aforementioned first visit to complainant's home, defendant and Leek made a second trip to complainant's farm, and on this occasion and again on Friday and Saturday of the same week, there were conversations and discussions between complainant and defendant with respect to the notes

executed by the Yellow Cab Coach Company which notes defendant was proposing to trade to complainant for the "equity" of the latter in the farm in question.

Complainant testified that defendant told him that the notes in question were good notes—"absolutely good notes, gilt edge notes;" that the Yellow Cab Coach Company was worth $50,000 and was making $20,000 a year, and, further that defendant did not tell him (and he did not know at the time he conveyed his farm to defendant) that there were any notes outstanding against the three busses other than the notes which defendant was proposing to trade to complainant.

Defendant testified that he told complainant that he "thought" the notes were "well secured" and "alright;" that the Yellow Cab Coach Company had sold the franchise for the line from Cleveland to Chattanooga and two busses for $20,000, and that this statement was true.

Again, defendant was asked and answered as follows: "Q. Did you ever tell Mr. Hamilton that this bus line property was worth $50,000, and would make $20,000 a year? A. I did not. I told him this, that the way the bus lines had been selling in the State of Tennessee it ought to bring around that price with the equipment that it had."

Defendant also testified that he told complainant there were thirty of the notes (against the busses) and that they aggregated "from $20,000 to $21,000."

Complainant testified that the aforesaid conversations between himself and defendant took place in the presence of Leek. This is not denied by the defendant and the trend of his testimony tends rather to confirm it. Leek's deposition was read on behalf of complainant, and he testified that defendant stated that "he considered the notes good;" that "they were first lien notes;" and that "he considered there was $50,000 of equity there protecting the paper."

From a consideration of the testimony of these three witnesses—complainant, and defendant and Leek—we find that defendant represented to complainant that the property of the Yellow Cab Coach Company was worth $50,000, and that he (defendant) thought the notes in question were good notes, "well secured" and "alright."

It is seen that the representations thus made by defendant to complainant were, at least in part, in the form of an expression of opinion. While it is an accepted general principle that fraud cannot be predicated upon a mere expression of opinion, the weight of authority supports the rule that an expression of belief by the vendor of a promissory note that the maker is responsible is equivalent to an assertion that he is so, if meant to be so understood and if made with a knowledge that he is not responsible. It is of no consequence that

the representation is made in the form of an opinion if it is meant to impress, and does impress, on the mind of the buyer that the note is good. See Case Note, 35 L. R. A., 424-426; Crane v. Elder (Kan.), 15 L. R. A., 795; Rothmiller v. Stein, 143 N. Y., 581; 26 L. R. A., 148, 152.

"If a person makes a statement for the fraudulent purpose of deceiving another and thereby inducing him to enter into a contract or assume an obligation, it is a fraudulent misrepresentation warranting relief to the party defrauded, although the statement relates to that which is properly matter of opinion rather than matter of fact, or although the person expressing it puts it forward as his opinion, if he knows it to be false or does not believe it to be true, or if he does not in reality hold any such opinion or holds a contrary opinion." Black on Rescission and Cancellation, Vol. 1, sec. 78, page 194.

Applying the above stated principles to the facts of this case, we are of the opinion that the record justifies the conclusion, and we find, that defendant made false representations to complainant with respect to the financial condition of the Yellow Cab Coach Company and the value of the notes in question, as alleged in complainant's bill.

The finding just stated makes it necessary for us to ascertain whether complainant relied upon such representations of defendant and was thereby induced to accept said notes of the Yellow Cab Coach Company as the consideration pro tanto for the conveyance of his farm to defendant, for "Courts of equity relieve only against fraud which is operative." Waterbury v. Netherland, 6 Heisk., 512.

On behalf of defendant it is said that "the complainant is shown to have acted upon his own investigation rather than the representations of the defendant," and that, in this view, complainant's bill cannot be maintained. In support of this insistence, the defendant, through his counsel, relies upon the following authorities: Farrar v. Churchill, 135 U. S., 609, 615, 34 L. Ed., 246, 250; Knuckolls v. Lea, 10 Humph., 576; Perkins v. McGavock, Cooke, 415; Flippen v. Knaffle, 2 Tenn. Chy., 238, 240; National Cash Register Co. v. Townsend (N. C.), 70 L. R. A., 349, 352; Note, 37 L. R. A., pp. 593, 600.

The principles which defendant's able counsel seek to deduce from the foregoing cases are stated in Farrar v. Churchill, supra, as follows:

"The general principles applicable to cases of fraudulent representation are well settled. Fraud is never presumed; and where it is alleged the facts sustaining it must be clearly made out. The representation must be in regard to a material fact, must be false and must be acted upon by the other party in ignorance of its falsity and with a reasonable belief that it was true. It must be the very ground on which the transaction took

place, although it is not necessary that it should have been the sole cause, if it were proximate, immediate and material. If the purchaser investigates for himself and nothing is done to prevent his investigation from being as full as he chooses, he cannot say that he relied on the vendor's representations. Southern Development Company v. Silva, 125 U. S., 247 (31:678). 'If the party to whom the representations were made,' remarked Lord Langdale, in Clapham v. Shillito, 7 Beav., 149, 'himself resorted to the proper means of verification, before he entered into the contract, it may appear that he relied on the result of his own investigation and inquiry, and not upon the representations made to him by the other party; or if the means of investigation and verification be at hand, and the attention of the party receiving the representations be drawn to them, the circumstances of the case may be such as to make it incumbent on a court of justice to impute to him a knowledge of the result, which, upon due inquiry, he ought to have obtained, and thus the notion of reliance on the representations made to him may be excluded.''

Before taking up the evidence bearing upon the question thus presented, it may be well to say that the mere fact that defendant refused to endorse the notes otherwise than ''without recourse,'' and that complainant finally agreed to accept them thus endorsed, will not afford defendant a defense in this suit, if, as charged in the bill, he made false representations to complainant and complainant accepted said notes in reliance upon such representations of defendant. Smith v. Cozart, 2 Head, 526, 531; George v. Johnson, 6 Humph., 36, 37; Baker v. Seahorn, 1 Swan., 54, 56, 55 Am. Dec., 724; Cabaness v. Holland (Tex. Civ. App.), 47 S. W., 376, 383.

Complainant testified that he relied entirely on the statements of the defendant and made no investigation concerning the notes in controversy other than ''through the defendant himself.'' However, the record shows that a limited inquiry concerning the credit of the Yellow Cab Coach Company was prosecuted by J. M. Leek, the real estate agent.

It appears that when complainant was ready to consummate the trade on Thursday, December 18, 1930, defendant had not endorsed the Yellow Cab Coach Company notes, and complainant was informed that defendant would not endorse them otherwise than ''without recourse,'' and complainant at that time refused to accept the notes and deliver the deed in the absence of an unrestricted endorsement of the notes by defendant; but two days later, viz: on Saturday, December 20, 1930, complainant accepted the notes endorsed by defendant ''without recourse,'' together with $95 in cash, and delivered a deed conveying his farm to defendant. In the interim between the aforesaid suspension of negotiations on Thursday and the closing

of the trade on Saturday following, J. M. Leek made some inquiries which he relates in his testimony as follows:

"Q. F. M. went over the matter with you in the absence of the complainant? A. Yes.

"Q. What did F. M. say to you on that occasion about trading and about endorsing the notes? A. Well, he said he was not inclined to endorse the paper, that the trade would have to go thru with the paper unendorsed by himself.

"Q. State fully what he said about the paper and about his endorsement? A. Well, he stated that it was not a question of his questioning the value of the paper but he was not inclined to endorse it and therefore he would have to let the trade go by default if his endorsement was required.

"Q. Did he say anything on that occasion about the notes being good? A. Yes, he assured me that the notes were good or that he considered the notes good.

Q. What did you and he do next after that in regard to this trade? A. Well, I made personal inquiries myself for my personal satisfaction of some local parties who I understood had some knowledge of the nature of the protection on the paper involved and after approaching two or three parties and getting from them a favorable statement I made a trip to Mr. Hamilton's home and stated that I was favorably impressed with the paper and with Mr. Galbraith's reputation which was very favorable that I would be inclined to consider it.

. . . . . . .

"Q. Now, you don't state as I understand you, that in the beginning that Mr. Galbraith told you he was going to endorse the notes? A. No.

"Q. But when it came down to the question of trading he specifically stated that he would not? A. Yes, he did.

"Q. Now, he stated, didn't he, that he did not want to take on any more obligations, that he was obligating himself to pay these mortgages and that he just didn't want to take on anything more? A. That was his statement.

"Q. And therefore that he would not endorse the notes although he thought the notes were good? A. Yes.

"Q. And thereupon as I understood you, you stated you would make some investigations to see what you could find out about the notes and talk to him later? A. Yes.

"Q. That is substantially what you stated? A. Yes.

"Q. Then you undertook to make some investigations and made inquiries of several people you thought would know about it and got favorable reports? A. Yes.

"Q. Did you see Mr. Hamilton after Mr. Galbraith told you that he would not endorse the notes and before these investigations were made of other parties or not or did he know that you were having this examination or investigation to see what you could find out about the paper? A. Yes.

"Q. And he approved, of course, of that course? A. Yes.

"Q. Did he make any investigation himself personally so far as you know or was it all done through you as far as you know? A. I don't know.

"Q. Did you go to Maryville or telephone to Maryville the site of the bus operations and talk with anybody over there as to what they thought about it? A. No.

"Q. Your investigations were made locally? A. Yes, locally.

"Q. Do you remember how many days there were intervening from the time Mr. Galbraith said he would not endorse them until you finished your investigation and determined the notes were good paper? A. Two or three days, is my recollection.

"Q. And then you got together for another meeting? A. Yes.

"Q. And at this later meeting you finally closed the trade? A. Yes.

"Q. Who was present when you finally closed the trade and when Mr. Hamilton finally accepted that arrangement and the trade was closed or agreed to? A. As I recall Mr. Hamilton, Mr. Galbraith and myself.

"Q. You three? A. Yes.

"Q. These were the same notes that were presented there that had been originally made out to A. D. Galbraith, Mr. F. M.'s paper, that had been endorsed without recourse by A. D.? A. Yes.

"Q. Now, when you got together finally, as I understood you, you stated to Mr. Galbraith that some investigation had been made and that the report was favorable and that Mr. Hamilton would take the notes, or that in substance? A. Yes.

"Q. And the trade was made on that basis and the deed passed? A. Yes. . . .

"Q. Did Mr. Hamilton employ you to make an investigation of the notes? A. No, he did not employ me, it was just the understanding that I was to make that investigation.

"Q. You say you never went to Maryville or telephoned to Maryville in regard to the status of the company? A. I did not.

"Q. Of whom did you inquire? A. I think Mr. O. B. Henderson of the E. Tenn. Savings Bank and the second party was, as I recall, the name Mr. Kraemer, I believe with the Tenn. Coach Co. and the third party was Claude Reeder.

"Q. Did you make that inquiry on your own account or at the instance of the complainant? A. Well, I would say both, because I was interested.

"Q. In getting the trade through? A. Yes, in getting the trade through.

"Q. Did you learn anything about what the Company had, as to whether it paid its obligations? A. Especially if it paid its obligations.

"Q. Did you get any statement from any source about the assets except through Mr. Galbraith? A. I did not."

It is evident that, as Leek testified, complainant was cognizant of and approved Leek's course in making inquiries about the Yellow Cab Coach Company. We quote from complainant's deposition questions and answers relating to this matter, as follows:

"Q. Now what did Leek say according to your recollection about the investigations that he had made about the notes? A. Well, he said, the way he talked to me that he had investigated it and with Mr. Galbraith's statement he considered them good. Mr. Galbraith said they were genuine gilt edge notes is the way Mr. Leek put it to me that the company was worth $25,000 and had a good business.

"Q. Did Mr. Leek tell you the extent of his investigations and who he had asked about it? A. He told me there were two men he had asked about it but I can't recall their names.

"Q. Do you remember Reeder? A. No, I don't remember him.

"Q. Do you remember O. B. Henderson? A. Yes.

"Q. That is one? A. Yes, that comes to me as being one of them.

"Q. Do you remember he said that he asked Kraemer who was president of another Bus Company? A. I won't say whether it was him or not, but two or three, but which it was I can't say because I don't recollect. . . .

"Q. Did you also have a representation about the solvency and assets of this company from any other source? A. No.

"Q. Than from Mr. Galbraith? A. No.

"Q. Did you employ anybody to make an investigation about the assets and solvency and condition of this company? A. No.

"Q. You say you relied entirely upon the statement of the defendant? A. Yes.

Recross-Examination.

By Judge Frantz:

"Q. How long was it after you found out he was not going to endorse the notes until you finally closed the trade? A. Well,

it was a day or two. I would not say the time. It was a short time.

"Q. You were considering the matter? A. Well, I was studying over it of course and he made a strong assertion that it was good and I took it to be just what he said and I traded solely on his representation.

"Q. And you had it under consideration for two or three days as to whether you would take it without his endorsement? A. Yes, I was studying it over a right smart."

Defendant testified that when the disagreement about the endorsement of the notes arose on Thursday, December 18th, complainant said that "he didn't know what to do;" that thereupon he (defendant) said "well, if you want to investigate the thing and want a little time, that is perfectly alright; you can take all the time you want;" that complainant then asked him (defendant) to give him until Saturday at noon and "he would investigate the thing and make up his mind whether he wanted to trade or whether he didn't," to which defendant agreed and then told complainant that he could go down to see Mr. Reeder, the man from whom the busses were bought, and could talk to Mr. Cockram, the president of the Yellow Cab Coach Company, and could call the bank of Maryville. Defendant's testimony that on Thursday complainant "wanted until Saturday sometime to investigate the notes" is corroborated by A. D. Galbraith.

Defendant testified further that on Saturday (December 20th) he met complainant and complainant's wife and Leek at the market house in Knoxville, and at that meeting either complainant or Leek made the statement that "they had investigated the thing and that they found out some things that they didn't know and that they were perfectly satisfied and ready to close up the trade," whereupon the trade was completed.

It appears that the assignment and transfer of the Yellow Cab Coach Company notes by defendant to complainant was made in the room of A. D. Galbraith at the Stratford Hotel in Knoxville shortly after the aforementioned meeting at the market house on Saturday, and A. D. Galbraith testifies that when complainant entered his room on that occasion, he (witness) asked complainant if he and defendant "ever got together," and that complainant replied in the affirmative, stating that "he had made a thorough investigation of the notes and found they were better than they had expected and that they would close the deal."

Complainant testified in rebuttal as follows:

"Q. State whether you told A. D. Galbraith on the occasion when you came in to close the trade that you wanted more time

to investigate the notes? A. I did not consider it as necessary for I believed what he told me.

"Q. State whether you told A. D. Galbraith or F. M. Galbraith that you had investigated the notes and found them satisfactory? A. No, I never did. I traded for the notes on the recommendation of F. M. Galbraith."

J. M. Leek was also examined in rebuttal and testified as follows:

"Q. Mr. Leek, you were formerly examined in this case? A. I was.

"Q. Were you present at the time the complainant came to Knoxville to meet A. D. Galbraith and close the deal? A. I was.

"Q. State whether the complainant said to A. D. Galbraith on that occasion, that he wanted more time to investigate the notes? A. He did.

"Q. Were you present when the trade was closed between complainant and defendant? A. I was.

"Q. State what complainant said to defendant on that occasion about the understanding and condition upon which he was taking those notes? A. Mr. Hamilton said he was not experienced in buying notes and that he was relying principally upon the statements of Mr. Galbraith about the value of the notes.

"Q. Did either you or J. P. Hamilton in your presence tell either F. M. Galbraith or Mr. A. D. Galbraith that you had investigated these notes and found them satisfactory? A. I do not recall such a statement.

Cross-examination.

By Judge Frantz:

"Q. As I understand it, when you met A. D. to close this deal on the day that defendant was in Chattanooga, complainant refused to take these notes without endorsement? A. Yes.

"Q. Did you make an investigation of the notes and were the reports favorable? A. Yes sir.

"Q. Did you make the investigation for yourself or Mr. Hamilton? A. I made it for both. I was interested in the deal."

In weighing the evidence in this case, and in endeavoring to ascertain the responsibility of defendant for his aforesaid representations to complainant, and the effect of the partial investigation made by Leek, the superior knowledge of defendant with respect to the condition and affairs of the Yellow Cab Coach Company should not be overlooked. It gives the color of assertions of fact to expressions phrased by defendant as opinions. Black on Rescission and Cancellation, Vol. 1, sec. 82, page 202; Shelton v. Healy, 74 Conn., 265, 271; Crossen v. Murphy, 31 Ore., 114, 49 Pac., 858; Wagner v. Lewis, 38 Neb., 320, 325; Auman v. McKibben, 179 Ill. App., 425; Stephens v. Ozburne, 107 Tenn., 572, 64 S. W., 902, 89 Am. St. R., 957.

It is said in 1 Black on Rescission and Cancellation, sec. 110, page 306, that

"It was held in a few early cases that false representations would not warrant the rescission of a contract unless it was shown that the injured party relied upon them solely and exclusively. But the modern and better rule is that relief should not be refused because it is shown that the party made inquiries in other directions and relied partly on what he thus learned, or exercised his own judgment to some extent, if it also appears that he also relied substantially on the representations made to him, and to such an extent that he would not otherwise have entered into the contract."

And again, in section 121, at page 345 of the same volume, it is said that, "the better opinion appears to be that a partial or limited examination of the subject-matter makes him responsible only for knowledge of what that examination actually discloses, and does not legally prevent him from relying on representations covering a wider range. And when he concludes a contract on the basis of representations made to him, which are false in fact, is not barred of relief by the mere fact that he sought and obtained other information on the same subject, where that information did not disclose the falsity of the representations."

We think the true rule is well stated by the Supreme Court of Minnesota in Meland v. Youngberg, 124 Minn., 446, 145 N. W., 167, Anno. Cas., 1915-B, 775, 779, as follows:

"If a buyer undertakes to investigate and determine the entire matter for himself, and is afforded a full and fair opportunity therefor, and in fact does make such investigation, and is permitted to make it as full and complete as he chooses, and he accepts the property after such investigation, the authorities are practically unanimous that he cannot be heard thereafter to assert that he relied upon the representations of the adverse party," but "if the buyer, instead of investigating as fully as he might, made only a partial investigation, and relied in part upon such investigation and in part upon the representations of the adverse party, and was deceived by such representations to his injury, he may maintain an action for such deceit."

For illustration of the application of the principle that in order for a defrauded vendee to avail himself of false representations made by his vendor, it need not appear that he relied solely upon such representations in making the contract, but it is sufficient if it appears that he made the trade in reliance upon the false representations, and would not have made it but for such representations of the vendor, see Smith v. Click, 4 Humph., 185, 187, and Buchanan v. Burnett, 102 Tex., 492, 119 S. W., 1141, 132 Am. St. R., 900, 902.

The record shows that no investigation for the purpose of ascertaining the value of the notes in question was made by or on behalf of complainant, other than the limited and partial one made by Leek. which consisted merely of an inquiry of three Knoxville men as to whether the Yellow Cab Coach Company had "paid its obligations."

It will not avail defendant to say that the means of information were open to complainant and he is chargeable with the facts which a thorough investigation would have disclosed. One who practices bad faith with another will not be permitted to invoke the doctrine of constructive notice in aid of his wrongdoing. 1 Black on Rescission, etc., sec. 110, p. 305; 2 Lawrence on Eq. Juris., sec. 854, p. 941.

We are satisfied that the complainant relied upon the aforesaid representations of the defendant, and that they were the inducing cause of complainant's acceptance of the notes in question. But for these representations by defendant, complainant would not have traded for the notes.

Complainant tendered with his bill all of said Yellow Cab Coach Company notes which defendant had transferred to him, and also offered to pay into court, or to the defendant, the sum of $95 representing the cash paid to him by defendant.

After complainant's bill was filed, defendant paid taxes on the farm in question amounting to $40.63; paid a debt owing by complainant to B. C. Ogle for $609.50 secured by a second mortgage on the farm in question, and paid an installment of $500 on the debt owing by complainant to the Prudential Insurance Company and secured by the first mortgage on the farm. Having paid these three sums after the bill was filed, all that equity requires is that a lien be declared on the land for defendant's reimbursement. Hawkins v. Byrn, 150 Tenn., 1, 12, 261 S. W., 980.

It results that the appellant's assignment of error is sustained, the decree of the Chancery Court is reversed, and a decree will be entered granting to complainant the relief sought by his bill. The costs of the cause, including the costs of the appeal, will be adjudged against the defendant F. M. Galbraith.

The cause will be remanded to the Chancery Court of Knox County for the execution of the decree and the adjustment of the equities of the parties in conformity to this opinion.

Crownover and DeWitt, JJ., concur.